No. 15.—DAVID R. ADAMS, guardian, &c. plaintiff in error, *vs.* NATHAN BASS, executor, &c. defendant in error. NA-THAN BASS, executor, &c. plaintiff in error, *vs.* FELIX LA-FORCE, *et al.* defendants in error.

[1.] B by his will, directed that a sufficiency of good, arable land should be purchased, either in the State of Indiana or Illinois, for all of his negroes to locate upon and cultivate, with a sufficiency of land for timber and fire-wood included—to be done within a reasonable time after his death, by his executors or any one or two of them ; and to remove all of said negroes to said tract or settlement of land, in the State of Indiana or Illinois, as afore-said ; recommending the titles to said land to be made to his executors in trust for the use of said negroes, for fear they might be defrauded out of the land, or squander it. The testator further directed, that after the removal and location of his negroes in their new home, that an outfit of farming utensils be purchased for them, including the wagons and teams used in their removal; and that a year's provision be found for their subsistence : *Held*, that as the intention of the testator could not be literally fulfilled, (the State of Indiana prohibiting, by her Constitution and Laws, and the State of Illinois by Statute, the introduction of negroes into these States,) nor the will executed upon the doctrine of Cypres, which does not prevail to the same extent in this State that it does in England; that the testator died intestate as to his slaves, and that a trust resulted for the heirs at law or next of kin.

[2.] Where the testator, by his will, directs the whole of his estate, real and personal, to be sold, except his negroes, and after defraying the expenses of the removal and settlement of his slaves in certain free States, the *balance* of the proceeds to be vested in bank stock for the use of his nephews and nieces, and the clause as to the slaves could not be executed : *Held*, that the testator constituted his nephews and nieces residuary legatees, not of his entire estate, so as to take the slaves on account of the invalid disposi-tion as to them, but of the proceeds of the property directed to be sold, and in part appropriated to other objects.

[3.] Where a testator directed his estate to be sold by his executors, and that after the removal, location and outfit of his negroes in Indiana or Illinois should be defrayed out of it, the balance of the proceeds to be vested in State bank stock by his executors, and the dividends thereon be equally divided as they should be declared, between his nephews and nieces, with-out limitation of time, and without making further disposition of said fund : *Held*, that this is a bequest of the *principal* as well as the interest, and that the whole vests absolutely and at once in the legatees : *Held further*, that it is optional with the legatees to elect to take either the property itself, its proceeds, or the bank stock in which the money arising from the sale was directed to be invested.

In Equity, in Putnam Superior Court.    Tried before Judge HARDEMAN, March Term, 1855.

Robert Bledsoe died, leaving the following last will and testament, which was admitted to probate :

STATE OF GEORGIA, &#125;
    PUTNAM COUNTY.

In the name of God, Amen: I, Robert Bledsoe, knowing the uncertaincey of life, and being now of sound and disposing mind and memory, do make and publish this, my last will and testament, as follows :

*Item 1st.*—I do hereby ordain, and constitute, and appoint, the Honorable Wilson Lumpkin, William Turner and Nathan Bass, of Georgia, and Walter Bullock and Garnett Watts of Kentucky, executors to this, my last will and testament.

*Item 2nd.*—I will and desire, that at an early period after my death, my grave be wattled in with hewn rock and covered with a marble slab, and my birth, (March 31, 1783,) as well as my death, be inscribed thereon and enclosed with an iron railing.

*Item 3d.*—I will and desire, that there shall be a sufficiency of good, arable land purchased, either in the State of Indiana or Illinois, for all my negroes to locate upon and cultivate, with a sufficiency of land for timber and firewood included; to be done within a reasonable time after my death by my executors or any one or two of them, and to remove all of said negroes to said tract or settlement of land in the State of Indiana or Illinois as aforesaid; but would recommend for the title to said land to be made to my executors, for fear they might be defrauded out of the land, or squander it themselves.

*Item 4.* I will and desire, after the removal and location of said negroes west of the Ohio river, that they be furnished an outfit of farming utensils, including the wagons and teams used in their removal, as a part of said outfit; and further

request, that there be also purchased for said negroes, the first year's provision for their subsistence after their removal.

*Item* 5.—I will and desire, that all my lands and landed property shall be sold on a credit of one and two years, titles to be made on the payment of the last of the purchase money, besides good personal securities; and I further desire, that the stock of horses, mules, cattle, sheep, hogs, crop of corn, &c. the household and kitchen furniture, and farming utensils, to be sold on a credit of twelve months, for notes with approved securities. I also desire, if there be a growing crop of cotton, for it to be completed for market, or a crop of cotton already on hand, ginned and packed, that said cotton shall be sold in Savannah or elsewhere, at private sale for cash, or even any other of the property of said estate which is designed to be sold, may be disposed of at private sale, provided a full and fair price or prices shall be obtained, either for cash in hand or on time, with the like securities mentioned above.

*Item* 6.—I will and desire, after the removal, location and outfit for my negroes shall have been completed in the State of Indiana or Illinois as aforesaid, that the balance or residue of the proceeds of my property shall be vested, by my executors, in stock of State Bank of Georgia, and whenever the dividends or profits of said bank stock shall be declared by said bank officers or their authority, that said dividends or profits shall be equally divided, year after year, between my nephews and nieces, the children of my late brothers, Richard Bledsoe, dec'd, and Jesse Bledsoe, dec'd, the former leaving three children, who I believe, reside in Missouri, and the latter, leaving two children, who reside in Georgia; my niece, Mary Frazer, daughter of the late Dr. Robert Frazer, is amply provided for if the property and money have not been wasted, and it being doubtful whether she is now in life from the last accounts of her bad health, I therefore leave her out of this bequest.

My object in wishing the investment to be made in bank stock, is that said nephews and nieces shall receive the profits

annually or semi-annually, according to the bank regulations; therefore, said legatees are not authorized, individually or collectively, to dispose of their interest in said bank stock; any manifestations directly or indirectly amounting to a demonstration of a disposition on the part of any one or more of said latter legatees to change the order or object of this, my last will, it shall work an entire forfeiture of said interest or interests in said estate, and thereby wholly change into a poor fund for the use and benefit of the poor people of the county of Putnam, so far as the interest or interests of said nephews and nieces designated in the bequest.

In testimony whereof, I, Robert Bledsoe, testator as aforesaid, hath hereunto set my hand and affixed my seal, the 17th August, 1846. Signed, published and signed in the presence of

Test: JUNIUS A. WINGFIELD,
    S. A. WALES,
    ROBERT F. TRIPPE,
    JAS. NICHOLSON, J.I.C.    ROBERT BLEDSOE, [L.S.]


Nathan Bass qualified as executor under this will. Subsequently, he filed a bill for direction, stating that the State of Indiana, prior to the death of General Bledsoe, and the State of Illinois, subsequent to his death, had passed laws prohibiting the introduction of negroes into either of those States; that it was impossible, therefore, to execute that portion of the will—and he submitted, whether, as to the negroes, the testator died intestate, or whether they pass under the residuary clause in the will? That one of the nephews of testator had died since the death of testator, leaving a widow and children—and he submitted, whether the trust continued, as to them? Upon these and all questions arising under the will he asked direction.

Upon the hearing the Court decided—1st. That the clause in reference to the negroes was not void under the Acts of 1801 and 1818; and that it could be carried into effect by

the negroes being sent to some other State or Territory, west or north-west of the Ohio river.

To this decision Counsel for the residuary legatees excepted, and have assigned error thereon.

The Court decided, that if the negroes and the provision for them fell back into the estate, they would not pass under the residuary clause, but there would be an intestacy as to this property. To this decision the executor excepted.

The Court also decided, that as the dividends of the bank stock were given absolutely to the residuary legatees forever, that the *corpus* also passed to them immediately. To this decision the executor excepted.

Upon these exceptions the executor assigned error.

ADAMS; DIOMITARI; J. WINGFIELD and CONE, for legatees.

E. A. NISBET, for the executor.

*By the Court.*—LUMPKIN, J. delivering the opinion.

[1.] The testator has directed that there shall be a sufficiency of good, arable land purchased, either in the States of Indiana or Illinois, for all of his negroes to locate upon and cultivate, with a sufficiency of land for timber and firewood included; to be done within a reasonable time after his death, by his executors, or any one or two of them; and to remove all of said negroes to said tract or settlement of land in the aforesaid States. 'And recommends that the title to the land so bought be made to the executors, for fear the slaves should squander or be defrauded out of it.

He further directs, that after the removal and location of his negroes, that there be purchased for them an outfit of farming utensils, including the wagons and teams used in their removal as a part of said outfit. And lastly, he requests that a year's provision be supplied for the subsistence of the negroes, after their removal and settlement.

It appears that Indiana, by her Constitution and laws, and Illinois, by Statute, have prohibited, under severe pains and penalties, the introduction of negroes into either of those States—the former *before* and the latter *subsequent* to the death of the testator.

1. Can this bequest in the will, as to the negroes, be carried into execution? Of course it cannot be, according to the expressed wish of the testator. And that, alone, would seem to be, as it ought to be, conclusive of the case. But the Courts of Great Britain, and to some extent of this country, whether wisely or unwisely, reasonably or otherwise, have taken it upon themselves, under certain circumstances, to perform a most delicate and responsible office; that is, to make another will for the testator, where his declared intention necessarily fails. However revolting this doctrine may be to common sense or repugnant to our own sense of right, we are content to administer it, for the present at least, notwithstanding Lord *Kenyon*, Lord *Eldon*, Lord *Denman* and the ablest of the English and American Judges have reprobated it in the strongest language.

After carefully examining the *Cypres* doctrine, as established in the text books as well as the adjudicated cases, we are inclined to adopt the principle as stated by Sir *James Wigram*. He says the meaning of it is now sufficiently understood, "In order to preserve and effect something which the Court collects from the will, to have been the paramount object of the testator, it rejects something else which is regarded as merely a subordinate purpose, namely: the mode of carrying out that paramount intention." *Vanderplanck vs. King*, (3 *Hare*, 11, 12.)

Let us apply this rule of approximation to this testament. Can it be collected from the will, that the paramount object of the testator was to give freedom to his negroes, and that Indiana and Illinois were selected only as the mode of carrying out that paramount purpose? We may conjecture so, especially as to substitute some other State or Territory northwest of the Ohio would be but a slight alteration of that

which is directed, but which cannot be performed. But the testator has not said so, and neither this nor any other Court can undertake to determine, judicially, what would have been his will provided he had foreseen what has happened. I might be willing to have my sons educated at Princeton College; and yet, prefer that the whole of them, were they numerous as the progeny of old Priam, should grow up in ignorance of the alphabet, rather than they should be taught at Yale. Still, these institutions are within less than a day's journey of each other.

General Bledsoe was a large landed proprietor in Indiana and Illinois, and had often visited those States. He is known to have entertained the most inveterate hostility to the neighboring State of Ohio. The differences which existed between the two former and every other north-western State may have constituted the sole motive with the testator for making the disposition which he did of his slaves. I do not pretend to say that this was so. It is sufficient that it may have been. Speaking for the last time by his last will, and without manifesting, by a single syllable, any general intent to manumit his slaves, and without once using the words "freedom," "emancipation" or any other term indicative, that any such object was uppermost in his mind, his sole and definite proposition is to have his negroes removed to Indiana or Illinois, and located on land to be bought for them there. Liberty, of course, would be the necessary terms of this disposition; and such, unquestionably, was contemplated by the testator. But to hold that he would have conferred the same boon, taking all the risks and disadvantages attendant on the change, anywhere else, is to assume what is incapable of proof. Upon this subject, he has not spoken and must remain silent forever; and we must be satisfied to continue ignorant of his wishes, further than he has seen fit to reveal them. All beyond is *terra ignota*, mere vague surmise, upon which we dare not act.

Had the testator directed his negroes to be manumitted in some place where they could, by law, enjoy this real or *ima-*

*ginary* blessing, and there stopped, his will might have been executed; certainly it could have been in England by the King as *parens patriæ*; and upon the information of the Attorney General, a scheme would have been devised for this purpose. Had he declared a general intent to free his slaves, and given specific directions for its execution, which could not be carried out, as in the present instance, still a Court of Chancery would execute the general intent as nearly as possible, in some other way. But I repeat, that here no such general purpose is manifested; but a precise disposition made upon the testator's own plan. The Courts, in such case, cannot execute the will *Cypres*; because the testator having declared a clear and intelligible purpose, and nothing more, that purpose, and none other, *is his will*. (*Adams' Equity*, 197, 1 *Spencer's Eq. Jur.* 532.)

Believing, as we do, that this doctrine has been misunderstood and misapplied, and it being the opinion of some, that the Courts are bound to devise some scheme to prevent the failure of a bequest of this sort, we will submit another familiar illustration. A testator in this State appropriates ten thousand dollars for the erection of a Presbyterian Church, and says no more. Here, the object being specified with sufficient certainty, the intention of the testator will be effectuated, notwithstanding he has omitted to designate the place which is to be the recipient of his bounty. The Courts will supply that defect rather than the charity shall miscarry. So, if the testator sets apart, by his will, ten thousand dollars for the building of a Presbyterian Church within the bounds of Hopewell Presbytery, and mentions Augusta as a suitable location, but no lot can be procured in that city for the purpose, here, no doubt another site might be chosen as within the plan of the testator, and the church would be decreed to be built at Macon or some other place. But suppose the testator should simply direct his executors to erect a Presbyterian Church at Milledgeville, the seat of Government, at a cost of ten thousand dollars, and the civil authorities should

refuse to allow it, or it should fail from any other cause. In that event, the Courts could not presume that the general idea of benevolence, in propagating the gospel, was foremost with the testator, and that the particular spot specified was merely illustrative; but they would be bound to hold that the individual purpose mentioned, was the only one in the testator's mind, and that if it should fail, he intended the property to go to his next of kin or heirs at law. And there is no equity to alter this disposition.

In the case, then, before us, as the design of the testator respecting his negroes cannot be accomplished, and the Courts are powerless to intervene, the slaves must descend to and be distributed amongst the heirs at law of the decedent.

As to the idea that these negroes go to the nephews and nieces, as residuary legatee, to my mind nothing can be clearer. I am aware that the English law goes far to favor the residuary legatees, because there the undevised residuum went to the executor. But no such reason exists here. The nephews and nieces may be properly called, under this will, partial residuary legatees, and that of a particular fund. There are no words going before or following after, to which the term "*balance*" can have relation, which would justify the conclusion, that it meant a residuum of the whole estate. It would be a great stretch of interpretation to say, that slaves are comprehended in "the balance of the proceeds of the sales," when this very sale was mainly for their benefit. To say that the slaves compose a part of the residue when the larger portion of that very residue is given for the use of the slaves themselves, would be manifestly absurd. Had the testator used the words, "the *balance* of his estate" or any other of equivalent import, the slaves might have passed under it. But we cannot interpolate words into a will; and without such interpolation, we think the slaves pass to the next of kin. (2 *Roper on Leg.* 182, 437–8. 1 *Hill's Ch. Rep.* 95. 1 *P. Wms.* 40. *Dev. and Batt, Eq.* 491.)

I will only add that, as a man, I do not regret the failure of this bequest. Look at the stringency of the laws of In-

·diana and Illinois and other Northwestern States, against persons of color, and reflect upon their thriftlessness, when not controlled by superior intelligence and forethought, and what friend of the African or of humanity, would desire to see these children of the sun, who luxuriate in a tropical climate and perish with cold in higher latitudes, brought in close contact and competition with the hardy and industrious population which teem in the territory northwest of the Ohio, and who loathe negroes as they would so many lepers? Courts should not be astute in so construing wills as to doom them to such a destiny. A stern and inexorable State policy equally forbids it. (See *Bryan vs. Walton*, 14 *Ga. Rep.* 185, 206.) As to the transportation of these slaves to Liberia, the wildest and most latitudinous application of the *Cypres doctrine*, could never, *under this will*, justify such a project as that.

.[2.] For the purpose of carrying into effect the bequest in the will which we have been considering, the testator directed the whole of his estate, real and personal, to be sold; and after the removal, location and outfit for his negroes should have been completed in the State of Indiana or Illinois, the balance or residuum of the proceeds of his property to be vested, by his executors, in the stock of the State Bank of Georgia; and that whenever the dividends should be ·declared, the same should be divided between his nephews and nieces, the children of his late brothers, Richard Bledsoe and Jesse Bledsoe, deceased. The testator gave as a reason for wishing this investment made in bank stock, that his nephews and nieces might enjoy the periodical profits without having authority, individually or collectively, to dispose of their interest in said stocks.

An important question arises upon this will, wholely overlooked in the argument. The point was fully and ably discussed at bar, whether the bequest as to the negroes being void, they would go to the legatees or descend to the heirs. But as no portion of the proceeds of the property is needed

for the slaves, what is to become of that fund ?   Does that go to the legatees or the heirs?

In the opinion of this Court, the whole goes to the legatees, not as a residuum, but by the express terms of the will. It is true that the *balance*, only, of this fund is given.   But this balance is indefinite, being dependent entirely upon the amount needed for the negroes.   Still, it is the entire balance, be it more or less.   If it took nine-tenths or ninety-nine-hundredths of this fund to colonize the slaves in Indiana or Illinois, what was left only was bequeathed to the nephews and nieces.   And we apprehend the converse of this proprosition is equally true, namely: that if none be needed for this purpose, the legatees take all.

Suppose the gift of this fund had been made in another form ; that is, subject to be diminished by so much as would be required to remove, locate and furnish the negroes for twelve months in their new home.   Is it not clear that in that case the legatees would take the whole—and are not the two cases substantially the same ?

Had the testator bequeathed a definite portion to the legatees, namely: two-thirds or three-fourths, to be applied to the use of the slaves and the remaining one-third or one-fourth to be vested in bank stock for his nephews and nieces, it would be plain that, *as legatees*, they could take no more ; and not only the negroes, but so much of the monied estate as was appropriated to their benefit, would go to the heirs at law.

It is plain, therefore, that the nephews and nieces are residuary legatees, if you please, not of the estate, but only of the proceeds of the property directed to be sold, and in part appropriated to other objects ; the word *balance*, having reference to what remains of the proceeds of the sale after paying certain charges and expenses, and not to any general residuum of the estate.

[3.] One other assignment of error only, remains to be disposed of.   His Honor, Judge HARDEMAN, held that the legatees took an absolute estate at once in the proceeds of the

property directed to be sold; whereas, it is insisted that the investment in bank stock, should at least be first made, and that the executory trust continues for and during the life of each legatee.

But what sufficient reason can be assigned, why the bequest should be limited to the life of the legatee? Our construction is, that it was a gift of the dividends to all the nephews and nieces, the children of Richard and Jesse Bledsoe, deceased, without limitation of *time*, and not in joint tenancy, but in common. And that upon the principle that a devise of the rents and profits of land, is a devise of the land itself; and that when the interest or produce of a legacy is given to or in trust for a legatee without limitation as to continuance, the principal will be considered as bequeathed also, and that absolutely an unconditional fee vested immediately in the legatees. (2 *Roper on Leg.* 331. 4 *Ves.* 51. 1 *Johns. Ch. R.* 494. 18 *Ves. R.* 463. 1 *Bro. Ch. C.* 532. 1 *Mad R.* 253. 2 *Ib.* 188. 8 *Co.* 95, *b.* *Cro. Jac.* 104. 1 *Ves. R.* 170, 523.)

In *Newland vs. Shepherd*, (2 *P. Wms.* 194,) the testator devised the residue of his real and personal estate to trustees in fee, in trust, to pay the *interest* thereof for the maintenance of his grand children until they should come of age or be married; and he went no further, nor made any other disposition of his estate; and yet, this was held to pass the absolute property to his grand children after the age of twenty-one. "This case," says Chancellor *Kent*, in *Earl vs. Gwin and Wife*, (1 *Johns. Ch. R.* 494,) "has been questioned, and perhaps very justly; for there was an express limitation of the period of the payment of interest to the minority of the children; *but in a case in which there is no such limitation, I apprehend the decision would be deemed correct.*"

In General Bledsoe's will, there is no limitation of the period of the payment of interest.

In *Philips vs. Chamberlaine*, (4 *Ves.* 51,) trustees were directed, by will, to pay the *dividends and interest* of certain stock and funds to the legatees, share and share alike, and

the survivor of them, as they attained the age of twenty-one. And the Master of the Rolls said he had never heard, that where the testator gave forever and without limitation, the dividends and interest to accrue upon the residue of his personal estate, that it would not carry the whole interest; and he apprehended that where the dividends and interest of the residue were given absolutely to the trustee on trust, to pay the interest and dividends to A from time to time, without any limitation of duration, it would carry the principal.

We deem it a work of supererogation to elaborate this point further.

4. Moreover, as this bequest is for the benefit of the legatees alone, it is competent for them to elect whether they will take the property itself, its proceeds, or the bank stock, in which the funds arising from the sales is directed to be invested. (1 *Roper on Leg.* 370–'1–'2–'3.)

We have been notified by our brother BENNING, that he shall dissent from so much of this opinion as recognizes the validity of the will, believing, as he does, that the whole testament is null and void, under the Acts of 1801 and 1818, prohibiting manumission.

This will has been proven and admitted to record by the proper tribunal, without contestation, and the executor comes into Court, *upon the will,* and asks direction as to its execution. Whether the will, therefore, as to the property or pecuniary legacies, be in issue, by the pleadings in this *forum,* may well be doubted. And although void as to the emancipation clause, so as to create an intestacy as to the slaves, it it may nevertheless be valid as to the other items. By the 17th section of the 1st article of the Constitution, it is provided, that no law or ordinance shall pass, containing any matter different from what is expressed in the title thereof. And yet, no Court in Georgia has ever held that the whole Act was a nullity; but only so much and such parts thereof, as were obnoxious to this constitutional inhibition.

But waiving these eobjections, I am content, for the present, to pass this point in silence, maintaining, as I do, that it is

no longer an open question in this State; but that the same was settled, and correctly settled, and had been by every department of the Government for more than a quarter of a century before the organization of this Court. And for the reasons of this opinion, I beg leave to refer to the case of *Cleland against Waters*, decided at Gainesville, October, 1854, and not yet published. If a change of policy is demanded by recent developements, it is for the Legislature, and not the Judiciary, to initiate it.

STARNES, J.—concurring.

Our brother BENNING agrees with Judge LUMPKIN and myself in the views which we take of the points presented in this case, if the will be valid; but he is of opinion that the will, as a whole, is invalid, because contravening the provisions and policy of the Acts of 1801 and 1818. On this point, therefore, the duty devolves upon me of assigning my reasons for the judgment with which I have concurred.

1. As no question has been made or decided in the Court below, upon the validity of the will as a whole, but the same has been duly and regularly admitted to record without issue upon this point, I am of opinion, that this subject is not now submitted for our consideration.

2. The second section of the Act of 1818, declares that the third section of the Act of 1801 shall be so construed as "to inhibit the recording only so much of any instrument (as is therein described) as shall relate to the manumitting or setting free of any slave or slaves." By inference, therefore, the Legislature intended to render invalid only thus much of any such instrument.

The fourth section of the Act of 1818, in terms quite as

general as the Act of 1801, declares, that "All and every will and testament, &c. or other instrument, in writing or by parol, made and executed for the purpose of effecting, or endeavoring to effect, the manumission of a slave or slaves, shall be, and the same are hereby declared, to be utterly null and void." But if, as is shown above, the same Act provides, that language of similar import in the Act of 1801 shall be construed to render valid only so much of the instrument as shall relate to the manumission, it is to be inferred that similar language is to receive the same construction in the Act of 1818. That latter Act, then, according to a construction which itself prescribes for itself, would render invalid only so much of this will as relates to the manumission of the slaves, if it affected it at all.

As we agree, however, that this portion of the will is void, because impossible to be executed, there is no occasion to consider whether or not it is void for any other cause.

3. As to the position, that a bequest of freedom to slaves, even though the emancipation is to take effect out of the limits of the State, is contrary to the policy of these Statutes, and therefore, void, I have a few observations to make.

It cannot properly be said that any transaction is contrary to the policy of a law, if the thing done is not prohibited or forbidden by that law. Whatever may have been said in the argument of the policy of these Acts of 1801 and 1818, it has not been successfully shown that they prohibit emancipation which is to take effect out of the State. In both Acts, such language is used as indicates a reference, by the Legislature, to emancipation within the limits of the State. The Act of 1801, for example, declares, that " the said slave or slaves so manumitted and set free, contrary to the true meaning and intent of this Act, shall be still, to all intents and purposes, *as much in a state of slavery as before they were manumitted and set free,*" &c. The application of such a provision to emancipation, by sending slaves into the free States, or to Liberia, would have been simply absurd. In the latter event, the manumitted slaves could not be placed, of course, as much

in a state of slavery as before they were set free.   The man-umission contemplated by the Act, therefore, must have been such, that to it this provision could be made applicable. ' If so, it was manumission *in the* State, and could be none other.'

So, too, the fourth section of the Act of 1818, referring to slaves who may be the subjects of intended manumission in the wills, deeds, &c. which were in contemplation, declares, that "Each and every slave or slaves in whose behalf such will or testament, &c. shall have been made, shall be liable to be arrested by warrant, under the hand and seal of any Magis-trate of this State, and being thereof convicted, &c. shall be liable to be sold as a slave or slaves," &c.   "Each and every slave in whose behalf such will or testament, &c. may be made," (that is to say, all such slaves as were in contempla-tion of the Act,) shall be arrested in the contingency speci-fied, by any Magistrate *of this State, &c.*   Of course, then, it follows, that the Act must have reference to such slaves as are emancipated within the jurisdiction of the State.

The preamble of this Act, too, declares what sort of man-umission was contemplated by the Legislature, and what was the "sound policy" of the State, which the passage of the Act was intended to promote.   It announces, that this pol-icy is to be considered with reference to the relations of free persons of color *within the State* to the free citizens and to the slaves thereof, as the number of the former may be in-creased "by manumission or by the admission of such per-sons to reside therein," &c.

What these Statutes do provide and were intended to provide, is thus shown very plainly.   And unless the policy of a law is to be sought and found outside of what the law was intend-ed to enact, and positively does enact, it cannot correctly be said, that the policy of these Acts is opposed to the manumis-sion of slaves, by sending them out of the State.

It seems to me, that this view of the matter is conclusive upon the subject of the policy of these Statutes, and decis-ively disposes of it.   But I must add, that I concur with my

brother LUMPKIN in thinking that this question of policy should be considered, now, as hardly an open question in our State. As was said in the case of *Cleland vs. Waters,* it has been decided according to the views which we now take of it, by Circuit Judges, by the Convention of Judges, and by this Court. And these decisions have been long acquiesced in by the Legislature, without interference.

As to what may be considered the truly sound policy *of the State* in this matter, that is another question, and a question for the legislator. Policy may demand that laws should be passed, if this can properly be done, prohibiting the removal of any slaves from the State for the purpose of emancipating them. But this has not been done yet, and we are called on in this case to say what the law is, and not what it should be.

Upon the subject of this State policy, however, I am not prepared to admit, that looking upon this question as a feature in the political economy of the State, that a law thus prohibiting every extra territorial manumission would be expedient and wise.

I, myself, doubt the policy of permitting free persons of color to be sent into the Northern and Western States of this Union, to increase the number of paupers and aid in swelling the abolition chorus by their votes and voices. Yet, several interesting and most cogent reasons can be assigned, why it would not be for the best interests of the slave holding citizens of the State to prohibit the removal of slaves from the State to any place whatever. But this is a subject which, to be properly treated, would require more to be said and shown than would become the limits of this judgment; I therefore forbear further to discuss it.

Adams, guardian, &c. *vs.* Bass, executor, &c.

BENNING J.—dissenting.

In these two cases, I dissent from the judgment of the Court. In my opinion, the whole will is void—doubly void— void both by the act of 1801 and the act of 1818. For this opinion, my reasons are as follows:

The will has in it these two items: "Item 3d. I will and desire that there shall be a sufficiency of good, arable land, purchased either in the State of Indiana or Illinois, for all my negroes to locate upon and cultivate, with a sufficiency of land for timber and firewood included; to be done within a reasonable time after my death, by my executors or any one or two of them, and to remove all of my said negroes to said tract or settlement of land in the State of Indiana or Illinois, as aforesaid, but would recommend for the title to said land to be made to my executors, in trust, for the use of said negroes, for fear they might be defrauded out of the land, or squander it themselves."

"Item 4th. I will and desire, after the removal and location of said negroes west of the Ohio river, that they be purchased an outfit of farming utensils, including the wagons and teams used in their removal as a part of said outfit; and further request, that there be also purchased for said negroes the first year's provision for their subsistence after their removal."

A part of another item is in these words: "I will and desire, after the removal, location and outfit for my negroes shall have been completed in the State of Indiana or Illinois, as aforesaid, that the balance or residue of the proceeds of my property shall be vested in stock of the State Bank of Georgia," &c.

The meaning of all this plainly is, that he, the testator, wills his slaves to be free, either in Indiana or Illinois; not only to be free, but to be the owners of land and other property. This Act of manumission he does in Georgia, in which too, are the negroes to be manumitted.

The Statute of 1801, to which I have referred, is entitled an "Act prescribing the mode of manumitting slaves in this State." The first section of it is as follows: "From and after the passing of this Act, it shall not be lawful for any person or persons to manumit or set free any negro, slave or slaves, any mulatto, mustizoe, or any other person or persons of color, who may be deemed slaves at the time of the passing of this Act, in any other manner or form than by an application to the Legislature for that purpose."

To manumit or set free, in *any other* manner or form than by an application to the Legislature, shall not be " *lawful.*" This is the section. Every manner or form of emancipation, except one, shall be unlawful. This is what the words plainly say. In these words is no ambiguity.

And in the interpretation of Statutes, it is the rule of rules, that the words, if unambiguous, are to be followed. We have, then, to follow these words; and when we do that, we have to say that the manner or form of manumission contained in the aforesaid parts of this will was not "lawful," for that manner or form is different from that only one which the words permit, viz : "by an application to the Legislature."

And if the manner and form of the manumission was not lawful, the Act of manumission was of course void ; that is to say, as much of the will as consists of the extracts aforesaid, was void.

This is the result from the first section of the Act.

By the last section, not only these parts, but the whole of the will is made void ; for that section prohibits, under penalty, the admission to record of "any deed of manumission or other paper, which shall have for object, the manumitting and setting free any slave or slaves." And no paper that cannot be admitted to record, can become a will—can, as a will, be otherwise than void.

It is true that this section is, by the second section of the Act of 1818, to " be construed to extend to inhibit the recording only of so much of any instrument (as is therein

described) as shall relate to the manumitting or setting free of any slave or slaves." But any implication from this, favorable to the notion that the rest of such an "instrument" is made valid, is rebutted by a part of the fourth section of the same Act of 1818, which declares that "all and every will and testament," &c., made and executed for the purpose of effecting, or endeavoring to effect, the manumission of any slave or slaves, either directly, by conferring or attempting to confer, freedom on such slaves, &c. &c., shall "be utterly null and void."

This being so, the nullifying power of the third section of the Act of 1801 is left in full force.

The result, therefore, from that third section, together with the first section, is to render this *whole* will void.

The result, then, from the Act of 1801, taken by itself, is to render this will void. And this is no doubtful result. It is the necessary result, from the words—from words entirely free from ambiguity ; from words, the meaning of which is too plain to be mistaken.

No subsequent law that could affect this result, was ever passed by the Legislature, at least never before 1818. If, therefore, this will had been made at any time after the Act of 1801, and before 1818, it would have been rendered null by the Act of 1801. There has, then, been a period of seventeen years since 1801, at any time during which this will would have been void.

Has not the period been longer than seventeen years ? Has it not continued up to this day ? It has, unless the Act of 1801 has been repealed, or in some way changed. The next question, therefore, is, has that Act been repealed or so changed as to affect its power of annulling wills like the one under consideration ? If so, it must have been done by the Act of 1818, for there has not been passed any Act touching the Act of 1801, other than the Act of 1818.

What, then, is the effect of the Act of 1818, on the Act of 1801 ?

The Act of 1818, is entitled "An Act supplementary to,

.and more effectually to enforce an Act, entitled an Act prescribing the mode of manumitting slaves in this State ;" that is to say, this very Act of 1801. This is the title of the Act of 1818—a title not to repeal that Act—not to change it in any way, but to add to it, and more effectually to enforce it. And this being the *title*, the Legislature, if they had had the wish to make the body different, could not constitutionally have made it so. (*Con. Art.* 1, *Sec.* 17.)

But the body of the Act corresponds with the title. The first section is, " that the Act, hereinbefore referred to" (the Act of 1801) " shall be strictly enforced ; but the penalties therein prescribed, except where the same shall be otherwise provided for by this Act, shall be increased to five hundred dollars," &c.

The second section prescribes a construction for the third section of the Act of 1801 ; a construction by which that section is to be held to prohibit the recording of so much only of instruments of manumission, as may relate to manumission.

And this is all the mention which the Act of 1818, in title or body, makes of the Act of 1801.

The Act, then, of 1818, so far from repealing or changing the Act of 1801, enforces that Act. The result, therefore is, that notwithstanding the Act of 1818, the Act of 1801 still retains all, at least of its original force, to nullify wills of the kind in question ; and therefore, the result is, that the will in question was nullified by the Act of 1801.

And here, on this Act of 1801, I might rest. It seems to me, that this Act, being taken to be in full force, there cannot be room for a doubt that it renders this will utterly void. If that be so, to go further could only be to slay the slain—to show the will doubly null if that were possible. Still I choose to go further.

I maintain then, that by the Act of 1818 itself, this will is ·rendered void. I maintain that this is so, both by the letter and the spirit of that Act.

And first it is so by the letter. Section four of the Act, is

Adams, guardian, &c. *vs.* Bass, executor. &c.

in these words—" All and every will and testament deed,. whether by way of trust or otherwise, contract, agreement, or stipulation, or other instrument in writing or by parol, made and executed for the purpose of effecting or endeavoring to effect, the manumission of any slave or slaves, either directly, by conferring or attempting to confer freedom on such slave or slaves, indirectly or virtually, by allowing and securing, or attempting to allow and secure to such slave or slaves, the right or privilege of working for his, her or themselves, free from the control of the master or owner of such slave or slaves, or of enjoying the profits of his, her or their labor or skill, shall be, and the same are hereby declared to be utterly null and void ; and the person or persons so making or executing any. such deed, contract, agreement, stipulation, or other instrument, in writing or by parol, and all and every person or persons concerned in giving or attempting to give effect thereto, whether by accepting the trust thereby created, or attempted to be created, or in any other way or manner whatsoever, shall be severally liable to a penalty not exceeding one thousand dollars, to be recovered in the manner hereinafter pointed out; . and each and every slave or slaves, in whose behalf such will or testament, deed, contract, agreement or stipulation, or other instrument, in writing or by parol, shall have been made, shall be liable to be arrested by warrant, under the hand and seal of any Magistrate of this State, and being thereof convict-ed, in the manner hereinafter prescribed, shall be liable to be sold as a slave by public outcry, as slaves, and the proceeds of such sales shall be appropriated in the manner specified in the first section of this Act."

"Every will," &c. " executed for the purpose of effecting or endeavoring to effect the manumission of any slave or slaves, either directly, by conferring or attempting to confer freedom on such slave or slaves indirectly or virtually," &c. shall " be utterly null and void," &c. These are the words of this fourth section, and they are too plain to be misunderstood. They make utterly null and void this will, if it was executed for the purpose of effecting, directly or indirectly, the manumission

of slaves—directly, by conferring freedom on the slaves them-
selves, or indirectly, by allowing the slaves the privilege of
working for themselves ; for the words make " *all and every*,"
such wills or will utterly null and void.. All. and every are
*universal* terms. They include wills made for effecting eman-
cipation outside of the State, as well as those for effecting
emancipation inside of the State. And this will is such a
will, for it was executed for the purpose of conferring free-
dom " directly" on slaves themselves, either inside or outside
of the State. Therefore, these words make this will void.
That is to say, the will is void by the *letter* of the Act.

But if it is void by the letter, it is also void by the spirit ; for
when the letter—the words of a Statute, are plain and unam-
biguous, it is *they* that are to be considered as *also* speaking
the spirit—the *true intent and meaning* of the Act. This,
nobody disputes, is the rule of rules in the interpretation of
Statutes. And these words are unmistakeably plain and un-
ambiguous.

Thus, then, I insist that I have made out my proposition,
.which was, that this will is void, both by the letter and the
spirit of the Act of 1818.

But I know that against this proposition, was used an argu-
ment drawn from the preamble of the Act, taken in connec-
tion with the tenth section.

The preamble of the Act is as follows : " *Whereas,* the
principles of sound policy, considered in reference to the free
citizens of this State, and the exercise of humanity towards
the slave population within the same, imperiously require that
the number of free persons within this State, should not be
increased by manumission or by the admission of such persons
from other States, to reside therein : *and whereas,* divers per-
sons of color, who are slaves by the laws of this State, hav-
ing never been manumitted in conformity to the same, are
nevertheless in the exercise and enjoyment of all the rights
and privileges of free persons of color, without being subject
to the duties and obligations incident to such persons, there-
by constituting a class of people equally dangerous to the

free citizens of this State, and destructive of the comfort and happiness of the slave population thereof, which it is the duty of this Legislature, by all just and lawful means, to suppress."

The tenth section is as follows : " It shall be the duty of all Courts and Judges before whom any proceedings may be had under this Act, so to construe the several provisions thereof as to carry the same into full and complete effect, according to the true spirit, intent and meaning thereof, as declared in the preamble of the same," &c.

The argument was this : that by the preamble of the Act, " the true spirit, intent and meaning" of the Act, is declared to be to prevent the increase of free persons of color *within the State ;* that by the tenth section, the Act is to be carried into effect "according to the true spirit, intent and meaning thereof, as declared in the preamble ;" and therefore, that even if the body of the Act goes so far as to prohibit wills, &c. manumitting slaves outside of the State, it is to be restrained by the preamble and the tenth section, to wills manumitting slaves inside of the State.

To this argument, waiving for the present the question whether, when the preamble of an Act and the body differ, the body is not to govern the preamble, rather than the preamble the body, I have two answers to make—first, I deny the conclusion—secondly, admitting the conclusion, I deny that it saves this will from the nullifying power of the body of the Act. I say, that this is a will, which, if effect is to be given to it, manumits the slave *within* the State, as well as without the State.

First, I deny the conclusion.   These are the premises viz : the body of the Act is to be construed according to the intent, as declared in the preamble ; the intent, as declared in the preamble, is to prevent the increase of free persons of color within the State.   Now, what is the true conclusion from these premises ?   Obviously this: The body of the Act is to be so construed, as to make it *most effectual* for preventing

the increase of free persons of color within the State.    But is it true, that the construction, which makes *valid* wills, &c. giving slaves their freedom *without* the State, is the construction which is most effectual to prevent the increase of free persons of color within the State?    The slaves, when they have become free without the State, can if they please, return as free persons into the State.    True, in doing this, they may violate a law of the State.    But how many laws of the State are violated—how easy without risking much, to violate this law.  In fact, has the law, practically, ever been anything more than a dead letter?    And then as to the validity of such a law, what grave question, under the Constitution of the U. S. has been made by half of the States of this Union, and by foreign nations under treaties of commerce and amity with the United States.    It seems to me that there is a construction far more effectual for preventing the increase of free persons of color within the State than this, and that is the construction which shall render *invalid*, even wills giving slaves their freedom *outside* of the State.    If such wills shall be held to be invalid, the effect will be, that the slaves they would free *will remain slaves;* and if the slaves remain slaves, it will be simply impossible that they can make any increase in the number of free persons of color within the State. Now I ask, is there any possible construction to be put upon the body of the Act, which would render it more effectual to prevent the increase of free persons of color within the State than this would?    At least, may I not ask, whether this construction would not be far more effectual to accomplish that purpose than would the other?    If so, then, the *true* conclusion from the premises is, that this construction is the one which the preamble and tenth section require to be put upon the body of the Act, in preference to the other construction—the construction, viz: which would render valid such wills, &c. as might manumit slaves outside, but not inside the the State.

And this is the construction which the words, themselves, of the body of the Act, as we have seen, call for.    Those

words are "all and *every* will" made for the purpose of emancipation, &c. shall be invalid—"utterly null and void." It seems, then, that the intent of the Act, as declared in the preamble, will be *most effectually* accomplished *by letting the words of the body of the Act have their full meaning.* Therefore, can there be a doubt that the true conclusion from the premises aforesaid, viz: the preamble and tenth section themselves, is that this will, even if it gives freedom, to be enjoyed only out of the State, is invalid?

Secondly, admitting the conclusion in the argument, I am answering to be the true one, I deny that that conclusion saves this will. The conclusion is, that the Act, read by the light of the preamble and the tenth section, tolerates wills which give freedom to slaves, if they give it to be enjoyed outside and not inside of the State. Now, I say, that conceding this to be the correct conclusion, I deny this will to be such a will. I say that if this will is sufficient to impart freedom without the State, it is sufficient to impart it within the State. I say that if it be true, that the slaves are to be free without the State, it follows that they can no longer be slaves within the State. My position is, that if we hold this to be a good will for the purpose of the exterior emancipation it provides for, we have to hold that it will have *the effect* to emancipate the slaves while they remain in Georgia, waiting for their place to be prepared for them, out of Georgia.

If, then, the will is held to be valid as to the exterior emancipation, the question is, what is to be the condition of the negroes, in the interval between the testator's death and the time of their contemplated exodus from the State? It cannot be a condition of slavery, for there is wanting to it any slave owner. There is nobody who is to have any title to the slaves during that time. If so, who is it? the executor? If the executor, then he must hold them as assests, and so merely in trust for the legatees, or heirs, or creditors. But the whole spirit of the will forbids the idea that the executor was so to hold them. Is it to be said, that the le-

.gal title will be in the executor, in trust for the negroes them-
selves? Be it so. That will make the negroes free, for that
will put the equitable title to the negroes in the negroes
themselves, and the equitable title to a thing is, in effect, the
whole title to it. On every view that I can think of, the re-
sult is the same, viz : that in the interval elapsing after the
testator's death, and before the departure of the negroes
from the State, they are to be free persons.

And if they are, during that interval, to be free within the
State, how are they ever to be got out of the State, unless
they, of their own accord, choose to go out? Suppose they
absolutely refuse to go out, is there any mode of compelling
them to go out? I know of none. Is there any person who
has the right to require them to go out? I know of none.
Is there any person who has the power to force them to go
.out? I know of none. What would be the form of proceed-
.ing against them, to get them out of the State—what would
be the form of the judgment—of the execution? Would they
be sent under a guard of soldiers, to the borders of the State,
.or passed from Sheriff to Sheriff, of the different counties
.through which their route would lie?

The simple truth is, that they could never be got out of
.the State, unless they chose to go out. If, therefore, they
.should not choose to go, they would stay, and thus they would
.permanently increase the number of free persons within the
State.

The result is, that this will, if good to make the slaves free
.out of the State, of necessity makes them, during the inter-
val that is to precede the time of their going abroad, free in
.the State ; and by making them, during that interval, free in
.the State, it gives them the option of being, during all time,
.free in the State. And what more than this could a will do,
.expressly conferring on them emancipation in the State?
And therefore, if such a will as that is according to the ar-
.gument I am answering, forbidden by the intent of the Act,
as declared in the preamble, then this must also be.

I say, therefore, that conceding to the argument I am an-

swering, that it was not the purpose of the preamble of this Act of 1818 to prohibit any wills, &c. except those which would manumit slaves *within* the State, it is not thence to be concluded that it was not the purpose of the preamble not to prohibit this will; for this will, if held to be good to manumit the slaves without the State, has, of necessity, to be held in effect to manumit them within the State.

The argument then, I insist, is answered.  But in giving the answer, I waived, for the time, the question whether, when the preamble of a Statute and the body differ, the preamble ought not rather to yield to the body, than the body to the preamble.  That question I waive no longer.  I now insist upon the maxim, that the body of a Statute controls the preamble, and not the preamble the body.

Let us, then, apply the maxim—the body of the Act declares that "all and every will," &c. executed for the purpose of effecting, or endeavoring to effect, the manumission of any slave or slaves, shall be "utterly null and void."  If the preamble differs from this, the preamble is, according to the maxim aforesaid, controlled by this.

Especially must this be true of the body of the Act of 1818, because the body of that Act agrees with the *title* of the Act, which is to enforce &c. the Act of 1801—an Act which, itself, annuls all sorts of manumission "in any other manner than by an application to the Legislature," and if the preamble differs from the body, it differs from the title, *and is,* therefore, in violation of the Constitution of the State.

I claim, also, the benefit of another leading rule of interpretation, and that is, the different parts of a Statute shall be construed together, and so construed, if possible, that every part shall stand and have its full effect.

Now I have already shown, that admitting the object of the preamble to be only to prevent the increase of free persons of color within the State, then, still the most effectual way of accomplishing the object would be to hold invalid *every* " will," &c. that would change slaves into free persons,

whether the will would make the change in the State or out of the State.

The body of the Act says, that every such " will," *shall* be invalid.

If, then, we so interpret as to say that every such will shall be invalid, we prevent any conflict between preamble and body, and give *full* effect to both.    Whereas, if we so interpret as to say that though the object, as declared in the preamble, was to prevent the increase of free persons of color within the State, yet, it was to prevent such increase only, by prohibiting " wills," &c. manumitting slaves within the State, we bring about a conflict between body and preamble; for the body prohibits " all and every will," &c. of manumission.    And the effect of such a conflict must always be, that some part of the Act shall give way.    The body shall enlarge the preamble, or the preamble shall contract the body.    We are bound, therefore, according to the last mentioned rule of interpretation, to interpret this Statute in the former and not in the latter of these two modes.

And again, the *title* of the Act comes in aid of this rule of interpretation, in the same way and to the same extent as it did in aid of the other rule.

And this concludes what I had to say on the Statutes of 1801 and 1818.

I will now sum up the propositions which I think I have established—

1.    That this will is void, by the plain words of the Act of 1801.

2.    That the Act of 1801 is still in full force—made to be in fullre force, if that were possible, by the Act of 1818.

3.    That the will is also void by the plain words of the Act of 1818; and that as the words are *plain, they* must be held to speak the *meaning* of the Act.

4.    That, however, if we are at liberty to take the preamble of the Act of 1818 as controlling the body, and not the body the preamble, then, still the true intent of the Act is not merely to prohibit " wills," &c. manumitting slaves inside of the

State, but "all and every will," &c. of manumission, because such universal prohibition is the *most effectual* way to prevent the increase of free persons of color within the State, the. prevention of which increase is, if we take the words of the preamble, the object of the Act.

5. That even if the true intent of the Act be allowed to be to prevent "wills," &c. manumitting slaves within the State, but not wills manumitting them without the State, yet, that this will is prohibited by this intent: for this will cannot be valid for the purpose of manumitting slaves without the State, unless it be held to have the effect to manumit them within the State during the interval that must precede their exit from the State.

6. That if the slaves become, during that interval, free in the State, it is at their mere option to say whether they will not stay during all time, free in the State.

7. That if the preamble would narrow the prohibition to "wills," &c. manumitting slaves within the State, it could not do it; for if it did, it would over-ride the body of the Act,. and the body of an Act rather over-rides the preamble, especially if the body agrees with the *title*, and the preamble does not.

8. That to interpret the preamble, as meaning to prohibit every "will," &c. manumitting slaves, is so to interpret it as to make it precisely agree with the body of the Act: whereas, to interpret the preamble as meaning to prohibit only "wills," &c. manumitting slaves within the State, is so to interpret it as to bring on a conflict between preamble and body, in which either preamble or body must be the sufferer.

If these propositions are true, this will is void—over and over again void. That is plain. Are they true? I think they have all been proved to be true. What is there to be urged against their truth? nothing of which I am aware, except some decisions, viz: (*Jordan vs. Heirs, &c. of Bradley, Dud. R.* 170.   *Roser vs. Marlow et al. R. M. Charlton's R.* 547.   *Vance vs. Crawford,* 4 *Ga. R.* 458.   *Cooper, adm'r vs. Blakey,* 10 *Ga. R.*)

In the first of these cases, which was decided in 1830, the report says: "The will, among other things, directs that if any of his slaves should desire to go to the African Colony, they should be permitted to go, and their expenses to the port of embarkation should be paid."

This will the Court, in three brief paragraphs, declares to be valid; and it puts its decision upon the ground, that " the Act of 1818, (*Prince's Dig.* 465,) and those which preceded, were intended to prevent the emancipation of people of color in this State, where their presence could not fail to be injurious to the slave population." And in aid of this ground, the Court adds, " the policy of our legislation, since 1798, has certainly been unfavorable to the increase of slaves within the State. The Constitution of that date, roundly prohibits the importation of slaves into this State from Africa or other foreign places, after the first day of October of that year."

In the next of the cases, the decision is, in the same brief manner, put upon the same ground.

In the third of the cases, the Court say, " owners can, in their lifetime, carry or send their slaves to the coast of Africa, to be colonized, or elsewhere, for the purpose of freeing them." " We hold it equally certain, that they can direct the same thing to be done by their executors after their death. *Foreign* emancipation neither conflicts with the letter or spirit of our municipal regulations relative to this subject. On the contrary, it is in accordance with our declared policy." "Domestic emancipation" however, is, the Court says, against " the settled and uniform policy of our Legislature." And the Court says that both of these dispositions are sustained by the Act of 1817, which " empowers the Governor to cause to be sold, all negroes, mulattoes or persons of color, who may be brought into this State in violation of the Act of the United States, to prohibit the importation of slaves into this country after the first day of January, 1808." The third section of the Act providing, that " if, previous to any sale of any such persons of color, the society for the colonization of free persons of color within the United States, will undertake to

transport them to Africa or any other foreign place which they may procure as a colony for free persons of color, at the sole expense of said Society, and shall likewise pay to His Excellency, the Governor, all expenses incurred by the State since they have been captured and condemned—His Excellency, the Governor, is authorized *and requested to aid in promoting the benevolent views of such Society, in such manner as he may deem expedient.*"

The decision in *Cooper vs. Blakey,* the last of the four cases, is put upon the ground, that the question had already been decided in the case of *Vance vs. Crawford.*

Are these decisions sufficient to overthrow the argument which I have advanced?  I think not.

I admit that decisions are excellent evidence of the meaning of a Statute, *if the language of the Statute give a doubtful meaning.*  But if the language of the Statute give a clear meaning, I deny that it is in the power of one or two, or any number of decisions, to make the Statute give a different meaning.  If the language of a Statute is clear, I deny that a Court is even *at liberty* to look beyond the language for a meaning—to look, for example, to what *it* may deem the spirit and reason, or as it is more vaguely called, the policy of the Statute.

If, in such a case, a Court is at liberty to look beyond the language for a meaning—if a Court is at liberty to hold that the Legislature did not mean what it says, then it follows, I insist, that what is law, does not depend on what the Legislature says, but on what the Judiciary says; and this, it seems, to me, is to make the Judiciary potentially the Legislature. If, therefore, in such a case, a Court should go beyond the language of the Statute for a meaning, and place its decision, upon the meaning thence obtained, the decision, in my opinion, would be one to be utterly disregarded in any future interpretation of the Statute.

Now, this, I think, is just what these decisions do.  And the argument which I have advanced, it seems to me, shows

it.   Let us apply some small part of that argument to these decisions.

The Act of 1801 says : " it shall not be lawful for any person or persons, to manumit," &c. "in any other manner or form than by an application to the Legislature for that purpose."

These decisions say it shall be lawful for a person to manumit in another manner than by an application to the Legislature, viz : in any manner at all, which shall have the effect to carry the manumitted slaves out of the State to any place at which they may enjoy freedom.

These decisions, then, it is evident, have to go beyond the language of this Act, to find a meaning on which they can place themselves.   And what is remarkable of *this Statute,* is, that beyond this language of it, there is nothing to which they can go for such a meaning.   *This* Statute is without a preamble.   The Act of 1818, with its preamble, is a subsequent Statute, as is, also, the Act of 1817, referred to in *Vance vs. Crawford.*

The Act of 1818, by *title* and body both, is only to enforce  and add to this Act of 1801.

These decisions, then, being, as it appears to me, contrary to the plain language of the Act of 1801, are not at all to be regarded in the interpretation of *that* Act.

Then, as to the Act of 1818, the language of the fourth section is : " all and every will and testament, deed," &c. " made and executed for the purpose of effecting, or endeavoring to effect, the manumission of any slave or slaves," &c. " shall be, and the same are hereby declared to be  utterly null and void," &c.   This language makes no exception.   " All and every ;"  there can be  *no*  " will," &c. for emancipation which these terms do not include.

Yet, these decisions say that any will made  for the purpose of  effecting the manumission  of slaves, is  not utterly null and void; but is good and valid, if the manumission to be effected, be a manumission not to be enjoyed in the State, but in some  other place, it makes no difference what other.   And

for a meaning to rest on, they all go, or seem to go, beyond these words to the preamble; and one of them, *Vance vs. Crawford*, goes, also, to the Act of 1817.

Admitting that the decisions may, in the case of this Statute, go to the preamble to hunt for a meaning by which to support themselves, I say they find none there.   I say, that in the preamble is to be found nothing inconsistent with the universality of the prohibition contained in the words aforesaid, quoted from the body—nothing which is not entirely consistent with that universality—for, conceding that the preamble means no more than to prevent the increase of free persons of color within the State, yet, is it possible to conceive of any more effectual way to do that, than to prevent slaves from becoming free persons at all—and that is the way to do it which, by these words, in the body of the Act, is prescribed.

These decisions, then, are, as it appears to me, contrary, also, to the clear language of the Act of 1818; and that being so, I deny that they can receive any support from the Act of 1817, even if that Act were such that it could not be read as perfectly consistent with the language of the Act of 1818; for the Act of 1818 is, of the two, the later Act.

And the decisions so being, as it appears to me, contrary to the clear language of the Act of 1818, they are, as I think, to be also disregarded in the interpretation of *that* Act.

And this, to one who entertains the opinions, as to the interpretation and observance of Statutes, which I entertain, would be enough to show these decisions insufficient to prevent this will from falling before these Statutes.

But these decisions seem, all, to have been put mainly, if not altogether, upon the notion that there is a sort of understood "policy" of the State which sanctions such decisions; and, therefore, it will be no more than respectful to the decisions that I briefly notice this notion; though, in doing so, I may have to pass into a region which I deem entirely exterior to the case—*the region of policy*.

What, then, are the decisions?   The first of them is, that a will which permits slaves to go to the "African Colony,"

is valid; the second is, that a will which directs slaves, in case they could not be freed by the Legislature, to be sent " where it can be done, out of the State," is valid; the third is, that a will which gives slaves to the Colonization Society " for the purpose of being sent to Liberia," is valid; and the third is, that a will which directs the executor to " take a slave to his residence in Kentucky, and as soon as she can be manumitted by the laws of said State, to have it done; but should the laws of Kentucky be adverse to manumission," then to take the slave to some other State, where she might " become free."

These are the decisions, and they seem to be characterized by a kind of growth: the first, sanctioning an act of manumission, by which the freedom given is to be enjoyed in the " African Colony"; the last, an act of manumission, by which the freedom given is, if possible, to be enjoyed in Kentucky, a slave State of this Union. If, in this last case, the will had said South Carolina or Alabama, instead of Kentucky, it is plain that it would have been sustained by the principle of this decision. This last decision then, in principle, amounts to saying, that if all the men in Augusta should, by wills, manumit their slaves and direct them to be carried across the river, four hundred yards, into Hamburg, the wills would be valid unless there should be something in the laws of *South Carolina* to make the wills invalid.

Now I must say, that decisions of this import are not sanctioned by any policy of the State with which I am acquainted.

What is policy—the policy of a State? and where is to be found the evidence of such policy? I suppose that the policy of a State, on any subject, is the general inclination of the State on that subject, and that the evidence of what that inclination is, we are to seek for in the laws and Acts of the State, taken as a whole, on that subject.

What policy, then, do the laws and Acts of this State show to be the State's in reference to emancipation? The earliest Act on the subject, that of 1801, makes, as we have seen,

Adams, guardian, &c. *vs.* Bass, executor, &c.

every form of manumission, except that founded on an application to the Legislature, unlawful.

The Act of 1818 does the same thing.    It is true, that this Act, in its preamble, recites that sound policy, considered in reference to the free citizens of this State, and the exercise of humanity towards the slave population within the same, requires that the number of free persons within the State should not be increased by manumission, or by the admission of such persons from other States to reside therein.    But if a manumission that retained the manumitted within the State, would be bad for the free citizens, and bad for the slave population, a manumission that sent the manumitted into a neighboring State, or even into a distant country, would be also bad for both, but bad in a less degree.    If the former sort of manumission would be calculated to produce among the slave population discontent, to be followed, on their part, by insubordination, massacre of free citizens, insurrection, and on the part of the free citizens, by a war of repression, with its sequel of punishments, and measures of precaution against the happening of such occurrences again, the latter sort of manumission would be calculated to produce the same things, but only, perhaps, a little less calculated to do so.    The great generic fact, *freedom*, would be common to both sorts, and it is this, that rising like a lone mountain, to be seen by all eyes far and near, would be the chief disturber of the unmanumitted slaves.    That this manumission was of the kind to be enjoyed in some other State of this Union, or even in some foreign country, rather than in this State, might perhaps make the manumission the more potent as a disturber, upon the principle, that "it is distance that lends enchantment to the view."    In manumission, in which the manumated remained in the State, the facilities for communication and combination between the manumitted and the unmanumitted, would, it is true, be greater than they would in the manumission, in which the manumitted were sent abroad. And this is the main, if not the only difference, between the

two kinds. But in the latter kind, these facilities would, at this day, be very great.

The reason, then, why the preamble of the Act declares it to be against sound policy, that slaves should be manumitted, to enjoy their freedom within the State, exists, in a great degree, to make it against sound policy, that slaves should be manumitted to enjoy their freedom out of the State.

And to the aid of this condemnation of this latter kind of manumission, afforded by the reason of the preamble, comes the body of the Act, with its sweeping clause, and says that "all and every will," &c. for the purposes of manumission, shall be void.

And this being so, there is nothing, as I think, in this preamble of the Act of 1818, to show it the policy of Georgia to tolerate emancipation, which is to be enjoyed abroad.

These two Acts then—the Act of 1801 and that of 1818, condemn every species of emancipation except one : that founded on an application to the Legislature. And they are the great, leading Acts on the subject. They, therefore, are the Acts to which, if to any, we are to go, to find out what is the *policy* of the State, as to emancipation.

These Acts, then, testify that every sort of emancipation is forbidden by the *policy* of the State.

There is another Act of the State, which bears high witness against the sort of emancipation that is to be enjoyed in the free States. The action of the State Convention of 1850, shows the State to feel a deep solicitude in the recovery of fugitive slaves, and especially, in the execution of the "fugitive slave law." But every manumitted slave that may be sent from the State to a free State, will make more difficult the recovery of such slaves, and the execution of that law. It is notorious, that the free negroes of the free States take a most active and efficient part in the scenes of violence and frequently of bloodshed, which attend attempts to recover fugitive slaves. Is it the policy of the State to make the recovery of fugitive slaves, in the future, more difficult than it is at present?

There are acts from which it is to be inferred, that emancipation, whether to be enjoyed at home or abroad, is not according to the policy of Georgia.    There is no Act which I know of, that authorizes the inference, that emancipation, to be enjoyed abroad, is according to the policy of the State.

The Act of 1817, which is cited in *Vance vs. Crawford,* as authorizing this inference, does not, in my opinion, at all authorize it.    The Act authorizes and requests the Governor to aid the Colonization Society in sending the Africans back to " *Africa* or any other *foreign* place which" the Society might " procure as a colony for free persons of color ;" it does not authorize or request him to aid in sending them to Indiana or Illinois, or to any other State of this Union.    And these Africans—what, under the Act of Congress, was their true condition, was a vexed question.    One thing is certain, their condition was such as to make it a perplexing matter to the State what to do in reference to them. · (*Daw. Com. Res.* 5, 41, 56, 65.    *Acts,* 310.)   The *leading* idea, too, in the Act is, that the Africans were to be sold by the Governer into *slavery.·*   I submit that no evidence of one policy or another, in regard to the question of emancipating *native* slaves, is to be drawn from this Act.

There remain the several Acts of the State on the subject of the traffic in slaves between this State and the other slave States.   This traffic has sometimes been forbidden, sometimes permitted.   But although the traffic has at times been forbidden, and is now forbidden, the introduction of slaves from the slave States into this, by citizens of this State, or by immigrants into this State, for use and not for sale, has, I believe, never been prohibited. ·

But surely it is putting a degree of violence on these Acts, to make them bear witness in favor of the existence of a policy on the part of the State, to sanction any sort of emancipation.   The most that can be said of any of these Acts, even the prohibitory ones, is, that they are not evidence of a policy that would *increase* the number of slaves within the State. It certainly cannot be said of any of them, that it is evidence of

a policy that would diminish the number of slaves already within the State.   But these Acts, as I conceive, were the result of mingled motives, but of which none was a motive of abolition.   The main reason for their enactment was, I think, a fear that this traffic, if permitted, would in the end, empty the more northern of the slave States of their slaves, and thus convert those States from friends and allies, into enemies and assailants.   The chief reason was, I think, not at all to promote abolition in this State, but to prevent abolition in other States.   Another reason was, no doubt, a disposition to keep the proportion of the free population to the slave from being materially changed.   And avarice, probably, had some degree of influence—the avarice of the slaveholders already in the State, the value of whose slaves would be diminished, as the supply from abroad should be increased.

And, doubtless, it was reasons of this kind, and perhaps others, which caused the State to insert in its Constitution a section prohibiting the importation of slaves from Africa and other foreign places, but permitting the importation from the other slave States.

I deny, however, that from this section of the Constitution, or from any Act of the State or of the State Legislature, any inference, whatever, is to be drawn in support of the proposition, that the State has ever favored or sanctioned a policy of emancipation or abolition of any sort.   I maintain that no Act of the State furnishes evidence of a wish that the number of slaves in the State should, in any mode, be *diminished ;* and that the very most that can be drawn from any Act or Acts of the State, is, that the State did not wish the number of slaves *increased.*

I have thus gone to all the sources known to me, from which evidence of what is the "policy" of the State on the subject of emancipation could be obtained.   And the result, I think, is, first, as I have just stated it, viz : that there exists no evidence going to show a policy on the part of the State in favor of any mode of *diminishing* the number of slaves within the State.   Secondly, that there does exist evi-

dence of the most decisive kind—evidence consisting in the plainest declarations of the Legislature—going to show a policy on the part of the State, hostile to every species of emancipation whatever.

Concluding this part of the subject, I may say that, in my opinion, what is the policy or most general view of the State, on the subject of emancipation, is to be gathered from the earliest Act on the subject : the Act of 1801, in which she says that it shall "not be lawful" to manumit, "in any other manner or form than *by an application to the Legislature* for that purpose." In this declaration, standing in force to this day, I think I see a disposition on the part of the State, to make *every instance of emancipation, however small, a question of State.* This, I think, is, and has ever been, the "*policy*" of the State.

The result, then, is, that I find nothing in these decisions to shake my confidence in the conclusions to which I had come in my argument, made before taking up the decisions for consideration. That argument was, as I thought, and as I think, supported by the plain language and the evident meaning of two Statutes; and if it was, it ought to prevail, I feel confident, over any number of judicial decisions. It seems to me that if, in the face of the Act of 1801, which says that the slave owner shall manumit in no other way than on—eby an application to the Legislature ; we can hold that such owner may yet do it in any other way, provided only he sends the slaves manumitted out of the State ; so anxious are we to get rid of slavery, we can, in the face of the Constitution, which says that the Legislature shall have no power to pass laws for the emancipation of slaves in any other way than one, viz : by consent of the owner, equally as well hold that the Legislature has, notwithstanding, power to pass laws for general emancipation in any way it pleases, with or without the consent of owners, provided only it sends away the slaves manumitted. If it is the policy of the State to be rid of slavery, provided it can also be rid of the slaves ; and if this

policy is so potent as to permit the citizen to disregard the words of a Statute, is it not potent enough to permit the Legislature to disregard the words of the constitution?

I dissent from the judgment of the Court in these two cases. I think the will was void.