FORD *et al. v.* THOMAS, administrator, *et al.*

1. Where a testator, in one item of his will, devised his real estate to designated trustees, "the annual product thereof to be by them appropriated to the erection of a poorhouse," in a named county, "and for the support of its inhabitants forever," and in another item made a bequest to a free school located at the county site, and the trustees, after they came into possession of the property so devised to them, by petition represented to the court that the income was insufficient to support a complete poorhouse, and prayed that they should be allowed to use it in establishing and supporting "such a technological, textile, manual, or other school," as they might deem advisable, to be at all times free to the citizens of the county," and the court, at the hearing, found that it was impossible and impracticable to establish and maintain a poorhouse with the income, there was no error in refusing to grant the prayer of the petitioners, the scheme proposed by them not being "next most consonant with the specific mode prescribed" by the testator for the execution of his charitable intent.
2. Trustees of the character above indicated are not, under the Civil Code, § 3168, required to make returns to the court of ordinary.
3. It was, however, erroneous to direct the trustees to distribute the annual income among charitable institutions or organizations in Richmond county, whose charity was limited to particular classes of indigent people, and the beneficiaries of which were not, and could not be, chosen by

the agents selected by the testator to dispense his bounty, it not appearing that it was impossible to devise a scheme which would more nearly approximate the specific mode which the testator prescribed.

Argued February 7,—Decided July 11, 1900.

Petition for direction. Before Judge Brinson. Richmond superior court. April term, 1899.

Richard Tubman, of Richmond county, died in 1836, leaving a will, executed in 1833, in which, after making various bequests,—one of them to the Free School of the City of Augusta, to which he gave certain shares of stock, the annual interest thereof to be applied to its support,—he provided as follows: "I give and devise to my . . wife, Emily H. Tubman, the entire balance of my estate . . . I do hereby constitute and appoint her my sole executrix of this my will, with the full hope and belief that she will use every means in her power to carry every part of this my will into complete effect." (Then follows a direction that she apply to the legislature to pass a law enabling her to manumit his slaves, and that, if such a law be passed, she present five thousand dollars to the University of Georgia, from that part of his estate which had been given to her.) "And furthermore, I request that my executrix distribute among the poor of the county of Richmond two thousand dollars. And that all the real estate that I may die possessed of in the city of Augusta, after the death of my wife, be and it is hereby given to the Trustees of the Richmond County Academy and their successors, the annual product to be by them appropriated to the erection of a poorhouse in said county, and for the support of its inhabitants forever." After the death of Emily H. Tubman the realty referred to in this item was turned over to the Trustees of the Academy of Richmond County, in pursuance of a decree rendered in the case of *City Council of Augusta* v. *Walton,* 77 *Ga.* 517. The trustees, with the sanction of the court, sold the realty and bought with the proceeds a tract of land, for the purpose of making it the site of the institution contemplated by the will, and invested the remainder of the fund in income-paying securities. Subsequently the trustees filed a petition for direction, representing that the annual income accruing upon the fund in their

hands is insufficient to support and maintain a complete poor-
house; that no necessity exists for such an institution as a
complete poorhouse, in or near the city of Augusta; as that
maintained by the public is sufficient to meet the demand, al-
though the city has grown in population from 5,000 at the
death of the testator to 50,000 at the present time; that while
the income in hand is not sufficient to support and maintain
a poorhouse in all its branches, yet it is sufficient to establish
and maintain some department of a poorhouse, or workhouse,
as defined by the lexicographers, and as generally exists; that
in England and in this State and county, in a poorhouse or
workhouse, provision is made for the useful employment of the
inmates in some industrial occupation; and that the petition-
ers, in the administration of the trust, resolved that a wise and
proper disposition of the income would be to establish, in some
part, the work of a poorhouse or workhouse, such as requires
industrial, technological or manual work by the inmates, as
the nearest and best charity to carry into effect the testator's
beneficence. They prayed that they be allowed to establish
and maintain such a technological, textile, manual, or other
school, as they should deem advisable, such school to be at all
times free to the citizens of the county of Richmond.

The administrator with the will annexed of Emily H. Tub-
man was made a party defendant. He demurred to the pe-
tition, and filed an answer in which he insisted, that if it should
be found undesirable or impracticable to devote the fund to the
specific purpose expressed in the will, then, according to the
doctrine of cy pres, the fund should be devoted in part to the
support of the Widows' Home, a charity already organized and
in operation in Richmond county; and that if the Widows'
Home should be held not entitled to the benefit of the fund,
there were in the city of Augusta two hospitals and a charitable
organization known as the King's Daughters, which more
nearly approximated the kind of charity defined in the will
than would a school of the kind referred to in the petition.
The Widows' Home intervened, and prayed that the trustees
be directed to pay over to it the income arising from the trust
fund. The case was submitted to the court upon the pleadings
and upon an agreed statement of facts, showing the nature of

the charitable institutions referred to in the pleadings, and
the provisions made for public schools and for the care of the
poor in Richmond county prior to the death of the testator
and since. The court held : 1. That the Trustees of the
Academy of Richmond County are not entitled to the relief
prayed for. 2. That it is now impossible and impracticable, as
set out in the petition, to execute the will of Richard Tubman
in the specific mode provided for in that item of his will which
relates to the establishment and maintenance of a poorhouse ;
and it being apparent that the intent of the testator was to af-
ford charitable relief to the poor and distressed of Richmond
county ; and it being further apparent that the charities estab-
lished and maintained by the Widows' Home, the city hospitals,
and other like institutions minister to the same objects of char-
ity as are provided for in the will; and it being further appa-
rent that, by appropriating the income of the fund to the ob-
jects aforesaid and similar objects, the court can by approxima-
tion give effect in a manner next most consonant with the
specific mode prescribed in the will : it is therefore ordered that
the Trustees of the Academy of Richmond County appropriate
annually the entire annual income of the fund in their hands,
arising since the filing of this bill, to the assistance and support
of such public and non-sectarian charities for the relief of the
poor of said county as in their discretion they deem most suit-
able; among which the court suggests the Widows' Home and
city hospitals and similar institutions; and that said trustees
make report to the ordinary of said county of their doings in
the premises, on or about January 1st of each year. 3. The
court reserves the right to modify or set aside this order, if at
any time in the future it shall be made to appear that the pur-
poses of the trust can be better subserved by the erection of a
poorhouse, or other disposition of said trust fund. To this
judgment, and to rulings upon certain demurrers which need
not be set out, the trustees excepted.

   *Frank H. Miller*, for plaintiffs.
   *Joseph R. Lamar* and *Irvin Alexander*, contra.

   FISH, J. The facts of this case will be found in the report-
er's statement of the same. We shall not deal with all the as-

signments of error contained in the bill of exceptions, as the view which we take of the case renders it unnecessary to do so. In this view, the questions raised by the petitioners in reference to the intervention filed by the "Widows' Home" and certain citizens, and those in reference to the answer of the administrator of the estate of the residuary legatee, are not material. We shall deal first with the main question, that is, whether the court erred in rejecting the scheme proposed by the trustees for executing, cy pres, the charitable intent of the testator.    The testator provided, "that all the real estate that I may die possessed of in the city of Augusta, after the death of my wife, be and it is hereby given to the Trustees of the Richmond County Academy and their successors, the annual product to be by them appropriated to the erection of a poorhouse in said county, and for the support of its inhabitants forever."    Representing to the court that the annual income accruing upon the fund in their hands "is absolutely insufficient to support and maintain a complete poorhouse," and that, "dealing with the situation as the trustees find it, no necessity exists for such an institution as a complete poorhouse, in or near the city of Augusta, as that maintained by the public is sufficient to meet the demand," and "that while the income in hand is not sufficient to support and maintain a poorhouse in all its branches, yet it is sufficient to establish and maintain some department of a poorhouse, or workhouse, as defined by the lexicographers, and as generally exists," the trustees prayed the court to be allowed to establish and maintain "such a technological, textile, manual, or other school," as they should deem advisable, such school "to be at all times free to the citizens of the county of Richmond," the same being, according to their contention, "one branch of a poorhouse."    No evidence was introduced at the hearing for the purpose of showing that it was impossible, with the means at the disposal of the trustees, to establish and maintain a poorhouse, but the case was tried simply upon the pleadings; the allegations of the petitioners in reference to the inadequacy of the income for this purpose not being denied.    It is to be observed, however, in this connection, that the only parties, other than the trustees, to the case were the administrator of the estate of the residuary legatee, who was made a party defendant

to the petition, and certain citizens and the "Widows' Home," who, by leave of the court, intervened and prayed that the trustees should be directed to pay over the income to that charitable institution, "under such terms and conditions as [might] be equitable and proper." The administrator simply contended that if it was "undesirable or impracticable to devote the funds in the hands of the petitioners to the specific purpose expressed in the will of Richard Tubman," such funds could not and should not be applied to the support and maintenance of "a textile, manual, or other school of the character referred to in the petition," but that, according to the doctrine of cy pres, the fund should be devoted to the support of the "Widows' Home," or if that institution should be held not entitled to the benefit of the testator's charity, he suggested the city hospitals and a charitable organization known as "The King's Daughters." The petition was filed on the 27th of September, 1898, and it appears from the showing therein made by the trustees that the trust estate in their hands consists of the corpus, amounting to $76,702.72, accrued income amounting to $19,476.82, and the Pike and Newby places, comprising 105 acres of land, which were purchased with income, at a cost of $5,000, and that the income from July 1, 1897, to July 1, 1898, was $4,731.48.

1. While we can understand how the trustees, from their point of view, may sincerely believe—as we have no doubt they do—that, with the limited means at their command, they can accomplish more good by establishing and supporting a school of the character which they propose than by erecting and maintaining a poorhouse, we must confess we are at a loss to see, from the showing which they make, how it is impossible and impracticable to establish and support a poorhouse in which, at least, a limited number of destitute people could find a home and a support. There are doubtless many poorhouses in this State, in which a number of indigent people are sheltered and supported, which have been erected and which are maintained with less means. But as the court below has found that is impossible and impracticable to carry out the intention of the testator in the specific mode which he prescribed, and as this finding is not excepted to, the question whether there was any real necessity for invoking the doctrine of cy pres in this

case is not before this court. As the case presents itself to us, this doctrine must be resorted to; and the question now to be determined is, whether the scheme proposed by the trustees and presented to the court for approval is "next most consonant with the specific mode prescribed" by the testator for the execution of his charitable intent. For "if the specific mode of execution be for any cause impossible, and the charitable intent be still manifest and definite, the court may, by approximation, give effect in a manner next most consonant with the specific mode prescribed." Civil Code, § 4007. In the petition and in the argument of the able and learned counsel for the plaintiffs in error much ingenuity has been displayed in endeavoring to demonstrate that "a technological, textile, or manual school" is, after all, but "one branch of a poorhouse," and upon this argument is based the proposition that, as it is impossible and impracticable to establish "a poorhouse in all its branches," the proper thing to do, under the doctrine of cy pres, is to establish and maintain such "a branch of a poorhouse." While we are inclined to think that this argument, especially as applied to the poorhouse system which existed in the testator's day, is more ingenious than sound, we will not stop to question its soundness here. For whether it be sound or unsound, one thing is very clear, and that is, that when the testator undertook to provide for the erection of a poorhouse and the support of its inhabitants forever, his purpose was not to erect and maintain an institution for the technical education of the young, but to provide, in Richmond county, a home and support for those who, from their condition and circumstances in life, should be fit subjects to become the inhabitants of such an asylum as a poorhouse and to be supported therein. A present home and a present support was what he intended. His intention was not that his benefaction should be used to prevent poverty or pauperism in the future, by qualifying the young to become breadwinners, but it was that it should be used for the purpose of providing shelter and support for those who should be already poverty stricken. To equip the young for the struggles of life would doubtless tend, in some considerable degree, to prevent poverty in the days to come, but it would not be providing for the present support of the indigent.

The testator not only provided for the erection and main-
tenance of a poorhouse, but he clearly indicated the exact pur-
pose for which he desired the poorhouse to be erected, and that
was "for the support of its inhabitants forever." To make his
intention unmistakably definite and clear, he directed that the
income of the property should be forever applied to the sup-
port of the inhabitants of a poorhouse. As if he looked into
the future and apprehended that there might come a time
when the trustees would think it advisable to apply the income
to some cognate purpose, he clinched his intention with the
sweeping word "forever." "Forever to the support of the in-
digent," is the keynote to his charity. Can the court, under
the doctrine of cy pres, take the income which he directed
should be forever applied to the support of those who should
be fit subjects to be sheltered and cared for in a poorhouse,
and apply it to free education—free to rich and poor alike
—so long as there is a sufficient number of people, in the
county of Richmond, outside of the county poorhouse, in ab-
solute need of the necessities of life, who are worthy objects of
charity, and for whose relief a proper scheme, under this will,
can be devised? We think not. But there are other items in
the will which, taken in connection with the one we are now
considering, show that the testator's mind was not upon edu-
cation of any kind when he made the devise in question. When
his thoughts were turned to higher education, he made a con-
ditional bequest "to the University of the State of Georgia,"
and when free education was uppermost in his mind, he made
a bequest "to the Free School of the City of Augusta." But
when he desired to secure the protection and support of those
who, by reason of age, physical infirmity, or other cause, should
be unable to obtain the necessities of life, he undertook to pro-
vide for the erection of a poorhouse and the support of its in-
habitants forever. Clearly, to divert this last-mentioned charity
from the support of the indigent to free education, even upon
purely practical lines, would be to turn it and the bequest to
the free school into the same channel. It would be to give
both to free education, which the testator never intended, and
which should not be done so long as it is possible to reach and
relieve the necessities of that class of the inhabitants of Rich-

mond county that the testator had in mind when he made the devise under consideration. If the trustees can not establish and maintain a poorhouse, it seems to us that they can, at least, use the income of the fund in ministering to the necessities of such destitute people in the county of Richmond as they may deem most worthy of the bounty of the testator.

It is contended that, "dealing with the situation as the trustees find it, no necessity exists for such an institution as a complete poorhouse in or near Augusta, as that maintained by the public is sufficient to meet the demand, although the city has grown in population from 5,000 at the death of the testator to 50,000 at the present time; that while the income in hand is not sufficient to support and maintain a poorhouse in all its branches, yet it is sufficient to establish and maintain some department of a poorhouse." This argument, if it proves anything, proves too much; for if there is no necessity for a complete poorhouse, because the public maintain such a poorhouse, which is sufficient to meet the demand, it would seem that there is no necessity to establish and maintain any branch of a poorhouse. Where is the necessity for establishing " some department of a poorhouse," if the poorhouse maintained by the county authorities is "a complete poorhouse," that is, "a poorhouse in all its branches"? But, with all due deference to the trustees and the learned counsel who so ably represents them, we are unable to see much force in the argument that there is no necessity for establishing a poorhouse. The fact that there is a poorhouse in Richmond county, in which the county authorities undertake to provide for the wants of the most destitute people, does not make the circumstances now so different from those which existed at the death of the testator as to render it unnecessary for the trustees of this fund to use the income in supplying the necessities of life to people in need of the same, who are not cared for in the county institution. The testator made the provision under consideration with full knowledge that such a county institution existed in his day, and, in the language of this court upon a former occasion, when this clause of the will was under consideration for another purpose, " The proper inference to be drawn from this provision of the will is, as it seems to us, that the testator

deliberately passed by the county corporation and the agents selected by it for the performance of this public duty, and conferred the power upon others, whom he preferred to dispense his charity. His expressed object was to establish out of his means, to be supported by the income of the property dedicated to that use, an asylum for the poor of Richmond County." *City Council of Augusta* v. *Walton*, 77 *Ga.* 522, 523. He was the judge of the necessity then ; and it can hardly be that now, when the population of the city is ten times as large as it was at his death, there is any less necessity for the particular charity which he designed than there was when he made his will. People of the same general class as those whom the testator intended to benefit are still in existence ; they have been from "time whereof the memory of man runneth not to the contrary," and, despite all the boasted advance of modern civilization, they are likely to be for an indefinite period of time in the future. They are in the city of Augusta, and doubtless elsewhere in Richmond county, as is shown by the existence there of the county poorhouse and such praiseworthy private charitable organizations as the "Widows' Home" and "The King's Daughters ;" and the existence and efforts of the latter two institutions show that they are not all cared for by the county authorities. So long as they do exist in Richmond county and are in need of assistance, it seems to us that a scheme can be devised which will more nearly approximate the intention of the benevolent testator than the one proposed to the court by the trustees.

2. Another question presented for decision by the bill of exceptions is, whether or not the trustees appointed by the will of Richard Tubman are required to make annual returns to the court of ordinary of Richmond county. The court adjudged that they were ; most probably basing his ruling upon the provisions of section 3168 of the Civil Code. In this view we do not concur. That section, we think, applies exclusively to trustees charged with the management of estates of which private individuals are the beneficiaries. We do not think it was intended to embrace trustees, created by will or otherwise, whose duty it is to manage religious, charitable, educational, or

other public trusts, and who, in the course of so doing, control and manage funds.

3. While the judge did right in rejecting the scheme submitted for his approval by the trustees, we think that there are two objections to the scheme set forth in the judgment which he rendered. He found that, "the charities established and maintained by the Widows' Home, the city hospitals, and other like institutions minister to the same objects of charity as are provided for in said will," and that, "by appropriating the income of the fund to the objects aforesaid and similar objects, the court can by approximation give effect in a manner next most consonant with the specific mode prescribed in the will;" and, therefore, ordered the trustees to "appropriate annually the entire annual income of the fund in their hands, arising since the filing of this bill, to the assistance and support of such public and non-sectarian charities for the relief of the poor of said county as in their discretion they deem most suitable, among which the court [suggested] the Widows' Home and city hospitals and similar institutions." One objection to this judgment is, it limits the scope and purpose of the testator's charity. The charity of the Widows' Home is limited to indigent women and the young children of such women, who may reside in the home with their mothers. The charity of the city hospitals is limited to poor people while they are undergoing medical or surgical treatment, who are unable to pay for such treatment and their support while they are inmates of these institutions. Each of these charities, and all other like institutions which minister to the wants of only a limited class of the destitute, fall short of the broad scope and purpose of the charity designed and intended by the testator. The charity which he intended is limited to no particular class of indigent people; it embraces male and female, old and young, married and unmarried, sick and well, Jew and Gentile, Catholic and Protestant, Christian and infidel — every individual residing in Richmond county, who is a worthy object of charity and a fit subject for a home for the destitute.

Another objection to the judgment is, it takes from the agents appointed by the testator the right to select, from the general class which he indicated, the particular persons who shall be-

come the recipients of his bounty. It takes from them the power and duty of dispensing his charity, and simply allows them to select, within the limitations of the order of the court, the particular institutions which shall dispense it. The discretion in selecting the beneficiaries, which the testator intended should be exercised by the trustees, is, under the order of the court, to be delegated by them to others, who are not subject to their authority or control. The court found that it was impossible and impracticable to establish and maintain a poorhouse with the means at the disposal of the trustees for this purpose; but until it is established that it is impossible to devise a scheme by which the agents of the testator's own selection can dispense his charity in a manner next most consonant with the mode which he prescribed, their right, their power, and their duty to dispense it should not be taken from them. It may be that, by allowing the income of the fund to accumulate for a few years longer, the scheme of the testator to provide a home and support for destitute people can be carried out. If it is found that it is impossible in this way, within a reasonable time, to establish and support such a home, it would seem that a nearer approximation to the specific mode prescribed by the testator than that indicated in the judgment of the court would be for the trustees to use the income of the fund in relieving the necessities of such people residing in the county of Richmond as they, in the exercise of a wise discretion, deem would be fit subjects for such a home, were one instituted. In this way the charity would not be limited to a particular class, or particular classes, of indigent people, and the power and duty of the agents selected by the testator to dispense it would not be taken from them.

The judgment is reversed, and direction is given that the court again, in the light of what is laid down in this opinion and of such evidence as may be introduced, investigate the question whether or not a poorhouse may be established and maintained in accordance with the testamentary scheme. To this end, any citizen of Richmond county who desires to do so may be allowed to intervene and introduce testimony. If it should still appear impossible to carry out that scheme, the court is directed to cause an inquiry to be made as to whether or not, by allowing the annual income to accumulate for a while longer,

the will of the testator can be effectuated· within·a reasonable time, in which event the court will frame its order to that end. If, however, it should be found that it is impossible to carry out the testamentary intention, either at once or after the lapse of a reasonable period, during which the annual income shall accumulate, then the court will enter a decree directing the trustees to themselves dispense the income in the manner above indicated.

*Judgment reversed, with direction. All the Justices concurring.*