# EVANS ET AL. *v.* ABNEY ET AL.

No. 60.   Argued November 12–13, 1969—Decided January 26, 1970

436

*James M. Nabrit III* argued the cause for petitioners. With him on the brief were *William H. Alexander, Jack Greenberg, Charles L. Black, Jr.,* and *Anthony G. Amsterdam.*

*Frank C. Jones* argued the cause for respondents. With him on the brief was *Charles M. Cork.*

*Deputy Solicitor General Claiborne,* by special leave of Court, argued the cause for the United States as *amicus curiae* urging reversal.

MR. JUSTICE BLACK delivered the opinion of the Court.

Once again this Court must consider the constitutional implications of the 1911 will of United States Senator A. O. Bacon of Georgia which conveyed property in trust to Senator Bacon's home city of Macon for the creation of a public park for the exclusive use of the white people of that city. As a result of our earlier decision in this case which held that the park, Baconsfield, could not continue to be operated on a racially discriminatory basis, *Evans* v. *Newton,* 382 U. S. 296 (1966), the Supreme Court of Georgia ruled that Senator Bacon's intention to provide a park for whites only had become impossible to fulfill and that accordingly the trust had failed and the parkland and other trust property had reverted by operation of Georgia law to the heirs of the Senator. 224 Ga. 826, 165 S. E. 2d 160 (1968).

Petitioners, the same Negro citizens of Macon who have sought in the courts to integrate the park, contend that this termination of the trust violates their rights to equal protection and due process under the Fourteenth Amendment. We granted certiorari because of the importance of the questions involved. 394 U. S. 1012 (1969). For the reasons to be stated, we are of the opinion that the judgment of the Supreme Court of Georgia should be, and it is, affirmed.

The early background of this litigation was summarized by MR. JUSTICE DOUGLAS in his opinion for the Court in *Evans* v. *Newton*, 382 U. S., at 297–298:

> "In 1911 United States Senator Augustus O. Bacon executed a will that devised to the Mayor and Council of the City of Macon, Georgia, a tract of land which, after the death of the Senator's wife and daughters, was to be used as 'a park and pleasure ground' for white people only, the Senator stating in the will that while he had only the kindest feeling for the Negroes he was of the opinion that 'in their social relations the two races (white and negro) should be forever separate.' The will provided that the park should be under the control of a Board of Managers of seven persons, all of whom were to be white. The city kept the park segregated for some years but in time let Negroes use it, taking the position that the park was a public facility which it could not constitutionally manage and maintain on a segregated basis.
>
> "Thereupon, individual members of the Board of Managers of the park brought this suit in a state court against the City of Macon and the trustees of certain residuary beneficiaries of Senator Bacon's estate, asking that the city be removed as trustee and that the court appoint new trustees, to whom title to the park would be transferred. The city

answered, alleging it could not legally enforce racial segregation in the park. The other defendants admitted the allegation and requested that the city be removed as trustee.

"Several Negro citizens of Macon intervened, alleging that the racial limitation was contrary to the laws and public policy of the United States, and asking that the court refuse to appoint private trustees. Thereafter the city resigned as trustee and amended its answer accordingly. Moreover, other heirs of Senator Bacon intervened and they and the defendants other than the city asked for reversion of the trust property to the Bacon estate in the event that the prayer of the petition were denied.

"The Georgia court accepted the resignation of the city as trustee and appointed three individuals as new trustees, finding it unnecessary to pass on the other claims of the heirs. On appeal by the Negro intervenors, the Supreme Court of Georgia affirmed, holding that Senator Bacon had the right to give and bequeath his property to a limited class, that charitable trusts are subject to supervision of a court of equity, and that the power to appoint new trustees so that the purpose of the trust would not fail was clear. 220 Ga. 280, 138 S. E. 2d 573."

The Court in *Evans* v. *Newton, supra,* went on to reverse the judgment of the Georgia Supreme Court and to hold that the public character of Baconsfield "requires that it be treated as a public institution subject to the command of the Fourteenth Amendment, regardless of who now has title under state law." 382 U. S., at 302. Thereafter, the Georgia Supreme Court interpreted this Court's reversal of its decision as requiring that Baconsfield be henceforth operated on a nondiscriminatory basis. "Under these circumstances," the state high court

held, "we are of the opinion that the sole purpose for which the trust was created has become impossible of accomplishment and has been terminated." *Evans* v. *Newton,* 221 Ga. 870, 871, 148 S. E. 2d 329, 330 (1966). Without further elaboration of this holding, the case was remanded to the Georgia trial court to consider the motion of Guyton G. Abney and others, successor trustees of Senator Bacon's estate, for a ruling that the trust had become unenforceable and that accordingly the trust property had reverted to the Bacon estate and to certain named heirs of the Senator. The motion was opposed by petitioners and by the Attorney General of Georgia, both of whom argued that the trust should be saved by applying the *cy pres* doctrine to amend the terms of the will by striking the racial restrictions and opening Baconsfield to all the citizens of Macon without regard to race or color. The trial court, however, refused to apply *cy pres.* It held that the doctrine was inapplicable because the park's segregated, whites-only character was an essential and inseparable part of the testator's plan. Since the "sole purpose" of the trust was thus in irreconcilable conflict with the constitutional mandate expressed in our opinion in *Evans* v. *Newton,* the trial court ruled that the Baconsfield trust had failed and that the trust property had by operation of law reverted to the heirs of Senator Bacon. On appeal, the Supreme Court of Georgia affirmed.

We are of the opinion that in ruling as they did the Georgia courts did no more than apply well-settled general principles of Georgia law to determine the meaning and effect of a Georgia will. At the time Senator Bacon made his will Georgia cities and towns were, and they still are, authorized to accept devises of property for the establishment and preservation of "parks and pleasure grounds" and to hold the property thus received in

charitable trust for the exclusive benefit of the class of persons named by the testator. Ga. Code Ann., c. 69–5 (1967); Ga. Code Ann. §§ 108–203, 108–207 (1959). These provisions of the Georgia Code explicitly authorized the testator to include, if he should choose, racial restrictions such as those found in Senator Bacon's will. The city accepted the trust with these restrictions in it. When this Court in *Evans* v. *Newton, supra,* held that the continued operation of Baconsfield as a segregated park was unconstitutional, the particular purpose of the Baconsfield trust as stated in the will failed under Georgia law. The question then properly before the Georgia Supreme Court was whether as a matter of state law the doctrine of *cy pres* should be applied to prevent the trust itself from failing. Petitioners urged that the *cy pres* doctrine allowed the Georgia courts to strike the racially restrictive clauses in Bacon's will so that the terms of the trust could be fulfilled without violating the Constitution.

The Georgia *cy pres* statutes upon which petitioners relied provide:

"When a valid charitable bequest is incapable for some reason of execution in the exact manner provided by the testator, donor, or founder, a court of equity will carry it into effect in such a way as will as nearly as possible effectuate his intention." Ga. Code Ann. § 108–202 (1959).

"A devise or bequest to a charitable use will be sustained and carried out in this State; and in all cases where there is a general intention manifested by the testator to effect a certain purpose, and the particular mode in which he directs it to be done shall fail from any cause, a court of chancery may, by approximation, effectuate the purpose in a manner most similar to that indicated by the testator." Ga. Code Ann. § 113–815 (1959).

The Georgia courts have held that the fundamental purpose of these *cy pres* provisions is to allow the court to carry out the general charitable intent of the testator where this intent might otherwise be thwarted by the impossibility of the particular plan or scheme provided by the testator. *Moss* v. *Youngblood,* 187 Ga. 188, 200 S. E. 689 (1938). But this underlying logic of the *cy pres* doctrine implies that there is a certain class of cases in which the doctrine cannot be applied. Professor Scott in his treatise on trusts states this limitation on the doctrine of *cy pres* which is common to many States [1] as follows:

> "It is not true that a charitable trust never fails where it is impossible to carry out the particular purpose of the testator. In some cases . . . it appears that the accomplishment of the particular purpose and only that purpose was desired by the testator and that he had no more general charitable intent and that he would presumably have preferred to have the whole trust fail if the particular purpose is impossible of accomplishment. In such a case the cy pres doctrine is not applicable." 4 A. Scott, The Law of Trusts § 399, p. 3085 (3d ed. 1967).

In this case, Senator Bacon provided an unusual amount of information in his will from which the Georgia courts could determine the limits of his charitable purpose. Immediately after specifying that the park should be for "the sole, perpetual and unending, use, benefit and enjoyment of the white women, white girls, white boys and white children of the City of Macon," the Senator stated that "the said property under no circumstances . . . (is) to be . . . at any time for any reason

---

[1] See, *e. g., First Universalist Society* v. *Swett,* 148 Me. 142, 90 A. 2d 812 (1952); *LaFond* v. *City of Detroit,* 357 Mich. 362, 98 N. W. 2d 530 (1959).

devoted to any other purpose or use excepting so far as herein specifically authorized." And the Senator continued:

"I take occasion to say that in limiting the use and enjoyment of this property perpetually to white people, I am not influenced by any unkindness of feeling or want of consideration for the Negroes, or colored people. On the contrary I have for them the kindest feeling, and for many of them esteem and regard, while for some of them I have sincere personal affection.

"I am, however, without hesitation in the opinion that in their social relations the two races . . . should be forever separate and that they should not have pleasure or recreation grounds to be used or enjoyed, together and in common."

The Georgia courts, construing Senator Bacon's will as a whole, *Yerbey* v. *Chandler,* 194 Ga. 263, 21 S. E. 2d 636 (1942), concluded from this and other language in the will that the Senator's charitable intent was not "general" but extended only to the establishment of a segregated park for the benefit of white people. The Georgia trial court found that "Senator Bacon could not have used language more clearly indicating his intent that the benefits of Baconsfield should be extended to white persons only, or more clearly indicating that this limitation was an essential and indispensable part of his plan for Baconsfield." App. 519. Since racial separation was found to be an inseparable part of the testator's intent, the Georgia courts held that the State's *cy pres* doctrine could not be used to alter the will to permit racial integration. See *Ford* v. *Thomas,* 111 Ga. 493, 36 S. E. 841 (1900); *Adams* v. *Bass,* 18 Ga. 130 (1855). The Baconsfield trust was therefore held to have failed, and, under Georgia law, "[w]here a trust is expressly created, but [its] uses . . . fail from any cause, a resulting trust

is implied for the benefit of the grantor, or testator, or his heirs." Ga. Code Ann. § 108–106 (4) (1959).[2] The Georgia courts concluded, in effect, that Senator Bacon would have rather had the whole trust fail than have Baconsfield integrated.

When a city park is destroyed because the Constitution requires it to be integrated, there is reason for everyone to be disheartened. We agree with petitioners that in such a case it is not enough to find that the state court's result was reached through the application of established principles of state law. No state law or act can prevail in the face of contrary federal law, and the federal courts must search out the fact and truth of

---

[2] Although Senator Bacon's will did not contain an express provision granting a reverter to any party should the trust fail, § 108–106 (4) of the Georgia Code quoted in the text makes such an omission irrelevant under state law. At one point in the Senator's will he did grant "all remainders and reversions" to the city of Macon, but the Supreme Court of Georgia showed in its opinion that this language did not relate in any way to what should happen upon a failure of the trust but was relevant only to the initial vesting of the property in the city. The Georgia court said:

"Senator Bacon devised a life estate in the trust property to his wife and two daughters, and the language pointed out by the intervenors appears in the following provision of the will: 'When my wife, Virginia Lamar Bacon and my two daughters, Mary Louise Bacon Sparks and Augusta Lamar Bacon Curry, shall all have departed this life, and immediately upon the death of the last survivor of them, it is my will that all right, title and interest in and to said property hereinbefore described and bounded, both legal and equitable, including all remainders and reversions and every estate in the same of whatsoever kind, shall thereupon vest in and belong to the Mayor and Council of the City of Macon, and to their successors forever, in trust etc.' This language concerned remainders and reversions prior to the vesting of the legal title in the City of Macon, as trustee, and not to remainders and reversions occurring because of a failure of the trust, which Senator Bacon apparently did not contemplate, and for which he made no provision." 224 Ga. 826, 831, 165 S. E. 2d 160, 165.

any proceeding or transaction to determine if the Constitution has been violated. *Presbyterian Church* v. *Hull Church,* 393 U. S. 440 (1969); *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964). Here, however, the action of the Georgia Supreme Court declaring the Baconsfield trust terminated presents no violation of constitutionally protected rights, and any harshness that may have resulted from the state court's decision can be attributed solely to its intention to effectuate as nearly as possible the explicit terms of Senator Bacon's will.

Petitioners first argue that the action of the Georgia court violates the United States Constitution in that it imposes a drastic "penalty," the "forfeiture" of the park, merely because of the city's compliance with the constitutional mandate expressed by this Court in *Evans* v. *Newton.* Of course, *Evans* v. *Newton* did not speak to the problem of whether Baconsfield should or could continue to operate as a park; it held only that its continued operation as a park had to be without racial discrimination. But petitioners now want to extend that holding to forbid the Georgia courts from closing Baconsfield on the ground that such a closing would penalize the city and its citizens for complying with the Constitution. We think, however, that the will of Senator Bacon and Georgia law provide all the justification necessary for imposing such a "penalty." The construction of wills is essentially a state-law question, *Lyeth* v. *Hoey,* 305 U. S. 188 (1938), and in this case the Georgia Supreme Court, as we read its opinion, interpreted Senator Bacon's will as embodying a preference for termination of the park rather than its integration. Given this, the Georgia court had no alternative under its relevant trust laws, which are long standing and neutral with regard to race, but to end the Baconsfield trust and return the property to the Senator's heirs.

A second argument for petitioners stresses the similarities between this case and the case in which a city holds an absolute fee simple title to a public park and then closes that park of its own accord solely to avoid the effect of a prior court order directing that the park be integrated as the Fourteenth Amendment commands. Yet, assuming *arguendo* that the closing of the park would in those circumstances violate the Equal Protection Clause, that case would be clearly distinguishable from the case at bar because there it is the State and not a private party which is injecting the racially discriminatory motivation. In the case at bar there is not the slightest indication that any of the Georgia judges involved were motivated by racial animus or discriminatory intent of any sort in construing and enforcing Senator Bacon's will. Nor is there any indication that Senator Bacon in drawing up his will was persuaded or induced to include racial restrictions by the fact that such restrictions were permitted by the Georgia trust statutes. *Supra,* at 439–440. On the contrary, the language of the Senator's will shows that the racial restrictions were solely the product of the testator's own full-blown social philosophy. Similarly, the situation presented in this case is also easily distinguishable from that presented in *Shelley* v. *Kraemer,* 334 U. S. 1 (1948), where we held unconstitutional state judicial action which had affirmatively enforced a private scheme of discrimination against Negroes. Here the effect of the Georgia decision eliminated all discrimination against Negroes in the park by eliminating the park itself, and the termination of the park was a loss shared equally by the white and Negro citizens of Macon since both races would have enjoyed a constitutional right of equal access to the park's facilities had it continued.

Petitioners also contend that since Senator Bacon did not expressly provide for a reverter in the event

that the racial restrictions of the trust failed, no one can know with absolute certainty that the Senator would have preferred termination of the park rather than its integration, and the decision of the Georgia court therefore involved a matter of choice. It might be difficult to argue with these assertions if they stood alone, but then petitioners conclude: "Its [the court's] choice, the anti-Negro choice, violates the Fourteenth Amendment, whether it be called a 'guess,' an item in 'social philosophy,' or anything else at all." We do not understand petitioners to be contending here that the Georgia judges were motivated either consciously or unconsciously by a desire to discriminate against Negroes. In any case, there is, as noted above, absolutely nothing before this Court to support a finding of such motivation. What remains of petitioners' argument is the idea that the Georgia courts had a constitutional obligation in this case to resolve any doubt about the testator's intent in favor of preserving the trust. Thus stated, we see no merit in the argument. The only choice the Georgia courts either had or exercised in this regard was their judicial judgment in construing Bacon's will to determine his intent, and the Constitution imposes no requirement upon the Georgia courts to approach Bacon's will any differently than they would approach any will creating any charitable trust of any kind. Surely the Fourteenth Amendment is not violated where, as here, a state court operating in its judicial capacity fairly applies its normal principles of construction to determine the testator's true intent in establishing a charitable trust and then reaches a conclusion with regard to that intent which, because of the operation of neutral and nondiscriminatory state trust laws, effectively denies everyone, whites as well as Negroes, the benefits of the trust.

Another argument made by petitioners is that the decision of the Georgia courts holding that the Baconsfield trust had "failed" must rest logically on the unspoken premise that the presence or proximity of Negroes in Baconsfield would destroy the desirability of the park for whites. This argument reflects a rather fundamental misunderstanding of Georgia law. The Baconsfield trust "failed" under that law not because of any belief on the part of any living person that whites and Negroes might not enjoy being together but, rather, because Senator Bacon who died many years ago intended that the park remain forever for the exclusive use of white people.

Petitioners also advance a number of considerations of public policy in opposition to the conclusion which we have reached. In particular, they regret, as we do, the loss of the Baconsfield trust to the City of Macon, and they are concerned lest we set a precedent under which other charitable trusts will be terminated. It bears repeating that our holding today reaffirms the traditional role of the States in determining whether or not to apply their *cy pres* doctrines to particular trusts. Nothing we have said here prevents a state court from applying its *cy pres* rule in a case where the Georgia court, for example, might not apply its rule. More fundamentally, however, the loss of charitable trusts such as Baconsfield is part of the price we pay for permitting deceased persons to exercise a continuing control over assets owned by them at death. This aspect of freedom of testation, like most things, has its advantages and disadvantages. The responsibility of this Court, however, is to construe and enforce the Constitution and laws of the land as they are and not to legislate social policy on the basis of our own personal inclinations.

In their lengthy and learned briefs, the petitioners and the Solicitor General as *amicus curiae* have ad-

vanced several arguments which we have not here discussed. We have carefully examined each of these arguments, however, and find all to be without merit.

The judgment is

*Affirmed.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, dissenting.

Bacon's will did not leave any remainder or reversion in "Baconsfield" to his heirs. He left "all remainders and reversions and every estate in the same of whatsoever kind" to the City of Macon. He further provided that the property "under no circumstances, or by any authority whatsoever" should "be sold or alienated or disposed of, or at any time for any reason" be "devoted to any other purpose or use excepting so far as herein specifically authorized."

Giving the property to the heirs, rather than reserving it for some municipal use, does therefore as much violence to Bacon's purpose as would a conversion of an "all-white" park into an "all-Negro" park.

No municipal use is of course possible where the beneficiaries are members of one race only. That was true in 1911 when Bacon made his will. *Plessy* v. *Ferguson,* 163 U. S. 537, decided in 1896, had held that while "separate" facilities could be supplied each race, those facilities had to be "equal." The concept of "equal" in this setting meant not just another park for Negroes but one equal in quality and service to that municipal facility which is furnished the whites. See *Sweatt* v. *Painter,* 339 U. S. 629, 633–634. It is apparent that Bacon's will projected a municipal use which at the time was not constitutionally permissible unless like accommodations were made for the Negro race.

So far as this record reveals, the day the present park was opened to whites it may, constitutionally speaking, also have been available to Negroes.

The Supreme Court of Georgia stated that the sole purpose for which the trust was created had become impossible. But it was impossible in those absolute terms even under the regime of *Plessy* v. *Ferguson.* As to *cy pres,* the Georgia statute provides:

> "When a valid charitable bequest is incapable for some reason of execution in the exact manner provided by the testator, donor, or founder, a court of equity will carry it into effect in such a way as will as nearly as possible effectuate his intention." Ga. Code Ann. § 108–202 (1959).

The Georgia court held that the doctrine of *cy pres* "can not be applied to establish a trust for an entirely different purpose from that intended by the testator." 224 Ga. 826, 830, 165 S. E. 2d 160, 164. That, however, does not state the issue realistically. No proposal to bar use of the park by whites has ever been made, except the reversion ordered to the heirs. Continuation of the use of the property as a municipal park or for another municipal purpose carries out a larger share of Bacon's purpose than the complete destruction of such use by the decree we today affirm.

The purpose of the will was to dedicate the land for some municipal use. That is still possible. Whatever that use, Negroes will of course be admitted, for such is the constitutional command. But whites will also be admitted. Letting both races share the facility is closer to a realization of Bacon's desire than a complete destruction of the will and the abandonment of Bacon's desire that the property be used for some municipal purpose.

Bacon, in limiting the use of this park property "to white people," expressed the view that "in their social

relations the two races (white and negro) should be forever separate and that they should not have pleasure or recreation grounds to be used or enjoyed, together and in common." Can we possibly say that test puts a curse on each and every municipal use—music festivals, medical clinics, hospitals?

Moreover, putting the property in the hands of the heirs will not necessarily achieve the racial segregation that Bacon desired. We deal with city real estate. If a theatre is erected, Negroes cannot be excluded. If a restaurant is opened, Negroes must be served. If office or housing structures are erected, Negro tenants must be eligible. If a church is erected, mixed marriage ceremonies may be performed. If a court undertook to attach a racial-use condition to the property once it became "private," that would be an unconstitutional covenant or condition.

Bacon's basic desire can be realized only by the repeal of the Fourteenth Amendment. So the fact is that in the vicissitudes of time there is no constitutional way to assure that this property will not serve the needs of Negroes.

The Georgia decision, which we today approve, can only be a gesture toward a state-sanctioned segregated way of life, now *passé*. It therefore should fail as the imposition of a penalty for obedience to a principle of national supremacy.

Mr. Justice Brennan, dissenting.

For almost half a century Baconsfield has been a public park. Senator Bacon's will provided that upon the death of the last survivor among his widow and two daughters title to Baconsfield would vest in the Mayor and Council of the City of Macon and their successors forever. Pursuant to the express provisions of the will, the Mayor and City Council appointed a Board of Man-

agers to supervise the operation of the park, and from time to time these same public officials made appointments to fill vacancies on the Board. Senator Bacon also bequeathed to the city certain bonds which provided income used in the operation of the park.

The city acquired title to Baconsfield in 1920 by purchasing the interests of Senator Bacon's surviving daughter and another person who resided on the land. Some $46,000 of public money was spent over a number of years to pay the purchase price. From the outset and throughout the years the Mayor and City Council acted as trustees, Baconsfield was administered as a public park. T. Cleveland James, superintendent of city parks during this period, testified that when he first worked at Baconsfield it was a "wilderness . . . nothing there but just undergrowth everywhere, one road through there and that's all, one paved road." He said there were no park facilities at that time. In the 1930's Baconsfield was transformed into a modern recreational facility by employees of the Works Progress Administration, an agency of the Federal Government. WPA did so upon the city's representation that Baconsfield was a public park. WPA employed men daily for the better part of a year in the conversion of Baconsfield to a park. WPA and Mr. James and his staff cut underbrush, cleared paths, dug ponds, built bridges and benches, planted shrubbery, and, in Mr. James' words, "just made a general park out of it." Other capital improvements were made in later years with both federal and city money. The Board of Managers also spent funds to improve and maintain the park.

Although the Board of Managers supervised operations, general maintenance of Baconsfield was the responsibility of the city's superintendent of parks. Mr. James was asked whether he treated Baconsfield about the same as other city parks. He answered, "Yes, included in my

appropriation . . . ." The extent of the city's services to Baconsfield is evident from the increase of several thousand dollars in the annual expenses incurred for maintenance by the Board of Managers after the Mayor and City Council withdrew as trustees in 1964.

The city officials withdrew after suit was brought in a Georgia court by individual members of the Board of Managers to compel the appointment of private trustees on the ground that the public officials could not enforce racial segregation of the park. The Georgia court appointed private trustees, apparently on the assumption that they would be free to enforce the racially restrictive provision in Senator Bacon's will. In *Evans v. Newton,* 382 U. S. 296 (1966), we held that the park had acquired such unalterable indicia of a public facility that for the purposes of the Equal Protection Clause it remained "public" even after the city officials were replaced as trustees by a board of private citizens. Consequently, Senator Bacon's discriminatory purpose could not be enforced by anyone. This Court accordingly reversed the Georgia court's acceptance of the city officials' resignations and its appointment of private trustees. On remand the Georgia courts held that since Senator Bacon's desire to restrict the park to the white race could not be carried out, the trust failed and the property must revert to his heirs. The Court today holds that that result and the process by which it was reached do not constitute a denial of equal protection. I respectfully dissent.

No record could present a clearer case of the closing of a public facility for the sole reason that the public authority that owns and maintains it cannot keep it segregated. This is not a case where the reasons or motives for a particular action are arguably unclear, cf. *Palmer v. Thompson,* 419 F. 2d 1222 (C. A. 5th Cir. 1969) (en banc), nor is it one where a discriminatory

purpose is one among other reasons, cf. *Johnson* v. *Branch,* 364 F. 2d 177 (C. A. 4th Cir. 1966), nor one where a discriminatory purpose can be found only by inference, cf. *Gomillion* v. *Lightfoot,* 364 U. S. 339 (1960). The reasoning of the Georgia Supreme Court is simply that Senator Bacon intended Baconsfield to be a segregated public park, and because it cannot be operated as a segregated public park any longer, *Watson* v. *Memphis,* 373 U. S. 526 (1963); see *Mayor & City Council of Baltimore* v. *Dawson,* 350 U. S. 877 (1955), the park must be closed down and Baconsfield must revert to Senator Bacon's heirs. This Court agrees that this "city park is [being] destroyed because the Constitution require[s] it to be integrated . . . ." No one has put forward any other reason why the park is reverting from the City of Macon to the heirs of Senator Bacon. It is therefore quite plain that but for the constitutional prohibition on the operation of segregated public parks, the City of Macon would continue to own and maintain Baconsfield.

I have no doubt that a public park may constitutionally be closed down because it is too expensive to run or has become superfluous, or for some other reason, strong or weak, or for no reason at all. But under the Equal Protection Clause a State may not close down a public facility solely to avoid its duty to desegregate that facility. In *Griffin* v. *County School Board,* 377 U. S. 218, 231 (1964), we said, "Whatever nonracial grounds might support a State's allowing a county to abandon public schools, the object must be a constitutional one, and grounds of race and opposition to desegregation do not qualify as constitutional." In this context what is true of public schools is true of public parks. When it is as starkly clear as it is in this case that a public facility would remain open but for the constitutional command that it be operated on a non-segregated basis, the closing of that facility conveys an

unambiguous message of community involvement in racial discrimination. Its closing for the sole and unmistakable purpose of avoiding desegregation, like its operation as a segregated park, "generates [in Negroes] a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." *Brown* v. *Board of Education,* 347 U. S. 483, 494 (1954). It is no answer that continuing operation as a segregated facility is a constant reminder of a public policy that stigmatizes one race, whereas its closing occurs once and is over. That difference does not provide a constitutional distinction: state involvement in discrimination is unconstitutional, however short-lived.

The Court, however, affirms the judgment of the Georgia Supreme Court on the ground that the closing of Baconsfield did not involve state action. The Court concedes that the closing of the park by the city "solely to avoid the effect of a prior court order directing that the park be integrated" would be unconstitutional. However, the Court finds that in this case it is not the State or city but "a private party which is injecting the racially discriminatory motivation," *ante,* at 445. The exculpation of the State and city from responsibility for the closing of the park is simply indefensible on this record. This discriminatory closing is permeated with state action: at the time Senator Bacon wrote his will Georgia statutes expressly authorized and supported the precise kind of discrimination provided for by him; in accepting title to the park, public officials of the City of Macon entered into an arrangement vesting in private persons the power to enforce a reversion if the city should ever incur a constitutional obligation to desegregate the park; it is a *public* park that is being closed for a discriminatory reason after having been operated for nearly

half a century as a segregated *public* facility; and it is a state court that is enforcing the racial restriction that keeps apparently willing parties of different races from coming together in the park. That is state action in overwhelming abundance. I need emphasize only three elements of the state action present here.

First, there is state action whenever a State enters into an arrangement that creates a private right to compel or enforce the reversion of a public facility. Whether the right is a possibility of reverter, a right of entry, an executory interest, or a contractual right, it can be created only with the consent of a public body or official, for example the official action involved in Macon's acceptance of the gift of Baconsfield. The State's involvement in the creation of such a right is also involvement in its enforcement; the State's assent to the creation of the right necessarily contemplates that the State will enforce the right if called upon to do so. Where, as in this case, the State's enforcement role conflicts with its obligation to comply with the constitutional command against racial segregation the attempted enforcement must be declared repugnant to the Fourteenth Amendment.

Moreover, a State cannot divest itself by contract of the power to perform essential governmental functions. *E. g., Contributors to the Pennsylvania Hospital* v. *City of Philadelphia,* 245 U. S. 20 (1917); *Stone* v. *Mississippi,* 101 U. S. 814 (1880). Thus a State cannot bind itself not to operate a public park in accordance with the Equal Protection Clause, upon pain of forfeiture of the park. The decision whether or not a public facility shall be operated in compliance with the Constitution is an essentially *governmental* decision. An arrangement that purports to prevent a State from complying with the Constitution cannot be carried out, *Evans* v. *Newton, supra;* see *Pennsylvania* v. *Board of Directors,* 353 U. S.

230 (1957). Nor can it be enforced by a reversion; a racial restriction is simply invalid when intended to bind a public body and cannot be given any effect whatever, cf. *Pennsylvania* v. *Brown,* 392 F. 2d 120 (C. A. 3d Cir. 1968).

Initially the City of Macon was willing to comply with its constitutional obligation to desegregate Baconsfield. For a time the city allowed Negroes to use the park, "taking the position that the park was a public facility which it could not constitutionally manage and maintain on a segregated basis." *Evans* v. *Newton, supra,* at 297. But the Mayor and Council reneged on their constitutional duty when the present litigation began, and instead of keeping Baconsfield desegregated they sought to sever the city's connection with it by resigning as trustees and telling Superintendent James to stop maintaining the park. The resolution of the Mayor and Council upon their resignation as trustees makes it very clear that the probability of a reversion had induced them to abandon desegregation. Private interests of the sort asserted by the respondents here cannot constitutionally be allowed to control the conduct of public affairs in that manner.

A finding of discriminatory state action is required here on a second ground. *Shelley* v. *Kraemer,* 334 U. S. 1 (1948), stands at least for the proposition that where parties of different races are willing to deal with one another a state court cannot keep them from doing so by enforcing a privately devised racial restriction. See also *Sweet Briar Institute* v. *Button,* 280 F. Supp. 312 (D. C. W. D. Va. 1967) (state attorney general enjoined from enforcing privately devised racial restriction). Nothing in the record suggests that after our decision in *Evans* v. *Newton, supra,* the City of Macon retracted its previous willingness to manage Baconsfield on a nonsegregated basis, or that the white beneficiaries of Senator Bacon's generosity were unwilling to share it with

Negroes, rather than have the park revert to his heirs. Indeed, although it may be that the city would have preferred to keep the park segregated, the record suggests that, given the impossibility of that goal, the city wanted to keep the park open. The resolution by which the Mayor and Council resigned as trustees prior to the decision in *Evans* v. *Newton, supra,* reflected, not opposition to the admission of Negroes into the park, but a fear that if Negroes were admitted the park would be lost to the city. The Mayor and Council did not participate in this litigation after the decision in *Evans* v. *Newton.* However, the Attorney General of Georgia was made a party after remand from this Court, and, acting "as parens patriae in all legal matters pertaining to the administration and disposition of charitable trusts in the State of Georgia in which the rights of beneficiaries are involved," he opposed a reversion to the heirs and argued that Baconsfield should be maintained "as a park for all the citizens of the State of Georgia." Thus, so far as the record shows, this is a case of a state court's enforcement of a racial restriction to prevent willing parties from dealing with one another. The decision of the Georgia courts thus, under *Shelley* v. *Kraemer,* constitutes state action denying equal protection.

Finally, a finding of discriminatory state action is required on a third ground. In *Reitman* v. *Mulkey,* 387 U. S. 369 (1967), this Court announced the basic principle that a State acts in violation of the Equal Protection Clause when it singles out racial discrimination for particular encouragement, and thereby gives it a special preferred status in the law, even though the State does not itself impose or compel segregation. This approach to the analysis of state action was foreshadowed in MR. JUSTICE WHITE's separate opinion in *Evans* v. *Newton, supra.* There MR. JUSTICE WHITE comprehensively reviewed the law of trusts as that law stood

in Georgia in 1905, prior to the enactment of §§ 69–504 and 69–505 of the Georgia Code. He concluded that prior to the enactment of those statutes "it would have been extremely doubtful" whether Georgia law authorized "a trust for park purposes when a portion of the public was to be excluded from the park." 382 U. S., at 310. Sections 69–504 and 69–505 removed this doubt by expressly permitting dedication of land to the public for use as a park open to one race only. Thereby Georgia undertook to facilitate racial restrictions as distinguished from all other kinds of restriction on access to a public park. *Reitman* compels the conclusion that in doing so Georgia violated the Equal Protection Clause.

In 1911, only six years after the enactment of §§ 69–504 and 69–505, Senator Bacon, a lawyer, wrote his will. When he wrote the provision creating Baconsfield as a public park open only to the white race, he was not merely expressing his own testamentary intent, but was taking advantage of the special power Georgia had conferred by §§ 69–504 and 69–505 on testators seeking to establish racially segregated public parks. As MR. JUSTICE WHITE concluded in *Evans* v. *Newton,* " 'the State through its regulations has become involved to such a significant extent' in bringing about the discriminatory provision in Senator Bacon's trust that the racial restriction 'must be held to reflect . . . state policy and therefore to violate the Fourteenth Amendment.' " 382 U. S., at 311. This state-encouraged testamentary provision is the sole basis for the Georgia courts' holding that Baconsfield must revert to Senator Bacon's heirs. The Court's finding that it is not the State of Georgia but "a private party which is injecting the racially discriminatory motivation" inexcusably disregards the State's role in enacting the statute without which Senator Bacon could not have written the discriminatory provision.

This, then, is not a case of private discrimination. It is rather discrimination in which the State of Georgia is "significantly involved," and enforcement of the reverter is therefore unconstitutional. Cf. *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715 (1961); *Robinson* v. *Florida,* 378 U. S. 153 (1964).

I would reverse the judgment of the Supreme Court of Georgia.