Hamilton INGRAM et al., Plaintiffs,

v.

Edward D. DUNN, in his Representative and Individual capacity, Defendant.

Civ. A. No. C 74–1478 A.

United States District Court,
N. D. Georgia,
Atlanta Division.

Oct. 11, 1974.

Jack Lasonde, Atlanta, Ga., for plaintiffs.

J. T. Lawler, Asst. Atty. Gen., Atlanta, Ga., for defendant.

## ORDER

JAMES C. HILL, District Judge.

The court has, for decision, defendant's motion to dismiss for failure of the complaint to state an actionable claim.

At first blush, it appears that, in deciding the issue thus presented, the court may be compelled to venture upon seas charted only by dimly lit and often reflected sign posts. On the surface, conflicting social and legal principles of some importance seem to clash, offering no real possibility for workable solution.

The plaintiffs are four individuals and two corporations. The individuals are each black Americans of African descent, citizens of the United States, who are employees of the United States Postal Service and, apparently, are members in the Atlanta Postal Credit Union [complaint, para. 4(b)]. The corporate plaintiffs, National Alliance of Postal and Federal Employees and The National Association for the Advancement of Colored People, are, respectively, a representative of black employees of the United States Postal Service and an organization devoted to the elimination of discrimination against black people in our country.

The defendant is the Commissioner of the Department of Banking and Finance of the State of Georgia. By virtue of the provisions of Chapter 25–1 of the Code of Laws of the State of Georgia, he has certain regulatory duties concerning credit unions chartered thereunder,[1] including, ultimately, their involuntary liquidation.[2]

The complaint alleges (and it is accepted as true for the purpose of this motion) that the Atlanta Postal Credit Union has engaged in racially discriminatory practices in hiring and promotion of employees and officers and in loan making policies and practices to the harm and damage of the individual plaintiffs. The plaintiffs have brought these practices to the attention of the Atlanta Postal Credit Union; to the National Credit Union Administration (which had no role to play, the Union not being federally chartered); and ultimately to the Department of Banking and Finance of the State of Georgia. Plaintiffs sought, in those representations, relief in the form of a compulsory surrender of the charter of the offending Credit Union.

Failing to achieve the requested relief, plaintiffs have instituted this action seeking:

(a) An order directing defendant Dunn, Commissioner of the Department of Banking and Finance, to revoke the certificate of approval of the Credit Union or to cause the Credit Union to surrender its charter;

(b) An order requiring defendant Commissioner to withhold the charter of the Credit Union "until such time as said Credit Union no

1. Ga.Code Ch. 25–1, known as the Georgia Credit Union Act, speaks of the Superintendent of Banks as being the official who exercises certain regulatory powers over credit unions. In the Executive Reorganization Act of 1972, Ga.Code Ch. 40–35, the functions of the Department of Banking were transferred to the Department of Banking and Finance. Specifically, Ga.Code Sec. 40–3598 provides:

All of the functions of the Department of Banking, and the position of Superintendent of Banks created in Ga.L.1919, p. 135, as amended (section 13–301 et al),

including the regulation of credit unions, are transferred to the Department of Banking and Finance. Unless inconsistent with this plan, any reference in Georgia Laws to the Department of Banking or the Superintendent of Banks means the Department of Banking and Finance.

In light of Sec. 3598 the court will use commissioner in place of superintendent when speaking about the powers conferred in Ga. Code Ch. 25–1.

2. See Note 8 *infra*.

longer follows a practice and pattern of racial discrimination in employment and loan practices;" and

(c) Judgement against the defendant in the sum of $900,000.

The action is brought under 42 U.S.C. Sec. 1983; jurisdiction is predicated upon 28 U.S.C. Sec. 1343 (3) and (4).

Defendant's motion asserts that the complaint fails to state, under 42 U.S.C. Sec. 1983 or any other statute, a claim against him, individually or officially upon which relief may be granted; that plaintiffs fail to show and cannot show that the denial of civil rights was either the result of actions by the State or under the color of any statute, custom, regulation or usage, of the State; that defendant Dunn is immune from personal liability in that his acts were the performance of official duties; and that, insofar as the complaint may seek an award of damages against the State, the same is prohibited by the Eleventh Amendment to the Constitution and the immunity of the State under Article III. The motion carries, as exhibits, copies of certain letters, an affidavit of the defendant and some official documents properly certified. Reference to these attachments are made in the briefs for both parties and, by treating the present motion as one for summary judgment (Tuley v. Heyd, 482 F.2d 590, 592 [5th Cir. 1973]), they may be referenced by the court.

It is well established that Section 1983 provides a private right of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage" of a State inflicts upon any "person" the deprivation of any right, privilege, or immunity secured to that person by the Constitution or federal law. The plaintiffs have alleged that they are suffering from a deprivation of rights and privileges inasmuch as they and other black persons are suffering from discriminatory practices of Atlanta Postal Credit Union.

State action seems to be alleged. The Commissioner of Banking and Finance of the State is charged with a failure to revoke the charter of the Credit Union. Clearly, inaction or omissions to act amount to action cognizable under Section 1983, Azar v. Conley, 456 F.2d 1382, 1387 (6th Cir. 1972). Whether the State subjects plaintiffs to discrimination by acts of commission or by omission is not important to this sort of case if it can be found that the deprivation resulted from the complained of act or omission.

Further, it appears from the complaint that those plaintiffs would not be subjected to discrimination if the defendant, in his official capacity, were to act as demanded; i.e., to revoke the charter of the offending Credit Union. Thus, at first blush, it appears that the complaint successfully asserts State action and discrimination resulting therefrom.

On the other hand, the court finds it difficult to accept the proposition that persons in positions similar to that of the defendant Commissioner are subject to an action of this sort. The ramifications of such a conclusion are so extensive as to challenge the imagination. Many things are forbidden by the Constitution of the United States and the laws enacted pursuant thereto. Unfortunately, many transgressions are committed by corporate bodies whose existence depends upon a charter granted by a State. If plaintiffs' argument is taken to its logical extension, the Secretary of State would be duty bound to revoke the charter of any corporation that broke any law. For instance, General Motors would be subject to having its charter revoked for discriminating in hiring. If such a remedy is not available under Sec. 1983, then there must be some valid legal principle that forbids it.

The onset of litigation and its resulting body of laws under 42 U.S.C. Sec. 1983 is a rather new development. Although the statute is a section of the Civil Rights Act of 1871, it has only re-

cently become the vehicle for extensive federal litigation.[3]

Therefore, when a new approach, such as the present one, is presented under this statute one is immediately inclined to feel that it must be measured by new and esoteric standards and guides. However, Section 1983 is but one statute in a body of laws which has served us well over the centuries and all of it that is relative must be considered in passing upon this or any other issue properly before the Court.

In Ellison v. Georgia Railroad Co., 87 Ga. 691, 706–707, 13 S.E. 809, 813, (1891), Justice Bleckley felt himself confronted with involved and confusing facts and circumstances. He gave the courts a valid guide for dealing with such cases when he observed, "[w]hen the right point of view is discovered, the problem is more than half solved." Therefore, it remains for the court to obtain the right point of view of the present case before proper decision can be made.

■ Let us first determine what must appear before a complainant states a valid claim under Section 1983. Professor McCormack observes[4] that two essential elements of such a cause of action are: (1) that it was a "deprivation" of a constitutional right, and, (2) that the deprivation was done under color of State law.

The court has already observed that the complaint adequately alleges deprivation of a constitutional right. It further appears that there was action (omission to act) under color of State law. Further, appropriate action sought by the plaintiffs would end the deprivation.

■■ Another statement of the essential elements of a 1983 claim may be found in Jones v. Bales, 58 F.R.D. 453, 457 (N.D.Ga.1972), aff'd, 480 F.2d 805 (5th Cir. 1973). There it was stated that a plaintiff states such a claim by alleging:

(1) That he has been deprived of a right, privilege, or immunity secured by the Constitution and laws of the United States;

(2) That the defendant caused the deprivation; and,

(3) That the defendant acted under color of State law.

These two statements of essentials of a claim under Section 1983 do not differ in substance. The second element in Jones says that the defendant must be the cause of the deprivation. Implicit in the second requirement as stated by Professor McCormack is the notion that deprivation is caused by someone acting under the color of State law. The court believes that a plaintiff must allege harm done in the legal sense of that verb, meaning that the State action must be the legal cause of the wrong. If this is correct, then our evaluation of plaintiffs' allegations will not be governed by the more charismatic new body of laws referred to above but rather, by well-established principles of 'causation reviewed by freshmen law students for many decades in basic case books and horn books.[5]

A fundamental concept to be grasped in an approach to the definition of cause is that of the *sine qua non*, also anglicized into the "but for" doctrine. Simply stated, it is that an act or omission cannot be the cause of an event if the event would have occurred without the

---

3. *See* McCormack, Federalism and Section 1983: Limitations on Judicial Enforcement of Constitutional Protections, 60 Va.L.Rev. 1 (1974).

4. *Id.* at 2.

5. This is not really surprising. Claims under Section 1983 are to be viewed against the background of tort liability that makes a

man responsible for the natural consequences of his actions. Monroe v. Pape, 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); Whirl v. Kern, 407 F.2d 781, 788 (5th Cir. 1969). As recently noted by the Fifth Circuit, fundamental tenets of tort law have application in Section 1983 cases. Holland v. Connors, 491 F.2d 539, 541 (5th Cir. 1974).

happening of that act or omission. Prosser, Law of Torts, Sec. 41 at 238 & ff. (4th ed.) It is clear that the State action complained of in this case satisfies the requirement that it be found a *sine qua non* of the wrong done to the plaintiffs. The plaintiffs could not have suffered deprivation of rights had the Atlanta Postal Credit Union not been granted a charter (act) or had the Commissioner revoked its charter (omission).

Merely establishing that the defendant's conduct satisfied the "but for" doctrine has never been considered sufficient to define it as the legal cause of the event under investigation. The lectures by law professors on this subject seldom fail to include the example of a driver who had, earlier in his journey, exceeded the speed limit and, therefore, brought his vehicle to the place along the highway at the exact time that a tree fell upon it. Though his earlier unlawful conduct was essential to the happening of the event, it is yet not considered the legal cause of injuries to his passenger. Indeed, birth is the *sine qua non* to death, but it does not appear on any certificates as the cause of death of mature people.

Further discussions of these basic principles would be redundant. Indeed, so would the above but for the fact that they cover the issue presently before the court.

If we are to find that the granting of a charter to the Postal Credit Union (or the failure to revoke it) satisfies the requirements for the present action, then the court must conclude that this State action was the legal cause of the deprivation of rights suffered by the plaintiffs. In the court's view, the complaint itself negates any such conclusion. It appears from the complaint that the actor in discrimination was the corporate body known as Atlanta Postal Credit Union. No charge is made, and none appears available, that the defendant Commissioner caused the Atlanta Postal Credit Union to hire or fire, promote or demote, lend or decline to lend on the basis of race, creed, or color. Granted that State action is shown to have been directly involved in giving life to the offending corporation, it does not appear that State action of omission or commission caused that corporate entity to engage in the offensive conduct. The legal cause must be the conduct of those in charge of the corporation. The act of creating or continuing the life of that entity is too remote to support the plaintiffs' action. *"In jure non remota causa, sed proxima, spectatur."*

The reasonableness of the result the court reaches is more clearly seen when the relationship between the Atlanta Postal Credit Union and the defendant Commissioner is viewed more closely. As already noted, the Department of Banking and Finance has certain regulatory power over credit unions. The first manifestation of this power comes when the charter for a credit union is obtained. Under Ga.Code Sec. 25–103, the by-laws of the proposed credit union must be approved by the Superintendent of Banks.[6] After commencing operation, a credit union must make at least semi-annual reports of condition to the Superintendent and be examined at least annually by the Superintendent.[7] Finally, under Ga.Code, Sec. 25–131 the Superintendent is empowered to liquidate involuntarily a credit union.[8] When the

---

6. The court finds noteworthy a Georgia Attorney General's opinion which defendant has attached to his brief. The opinion states that the Commissioner may not arbitrarily decline an application which is in order and not inconsistent with the terms of the Act.

7. *See* Ga.Code Sec. 25–122.

8. In relevant part Ga.Code Sec. 25–131 states:

"Any credit union organized under the laws of this State shall be involuntarily liquidated in the circumstances and under the procedures set forth by his section as follows: (1) Whenever it shall appear to the Superintendent of Banks upon an examination of any credit union created under the laws of

relationship between the Atlanta Postal Credit Union and the Commissioner is examined, it becomes apparent that the regulatory powers relate to the financial condition of a credit union. Thus, it makes sense to rule that the defendant is not accountable under Section 1983 for the discrimination about which plaintiffs complain.

■ A case which notes the distinction between state caused and privately caused discrimination is Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). In *Irvis* the court held that the Pennsylvania Liquor Control Board's regulatory scheme did not sufficiently implicate the State in Moose Lodge's discriminatory practices so as to make the equal protection clause applicable. There was, however, one exception to the court's ruling. The Liquor Control Board's regulations required that every licensee adhere to all provisions of its (the Club's) constitution and by-laws. Since Moose Lodge's by-laws called for discriminatory practices, the effect of the Board's regulation was to require discrimination. Thus, the Board's regulation in effect making the Club's by-laws a requirement of the State Board, operated as a clear cause of the offensive conduct and violated equal protection. The implication from *Irvis* is, therefore, that a licensing agency is not the legal cause of discrimination unless some agency regulation requires or fosters the discrimination.[9] Stated otherwise, regulation by itself does not give rise to state action. The Fourteenth Amendment is not triggered until state sanctions are placed behind the discriminatory policies.

■ The instant case is one in which the State only regulates; plaintiffs have not alleged that the State sanctions the alleged discriminatory policies. As aforementioned,[10] the Commissioner of Banking and Finance approves the by-laws of proposed credit unions and he is required by statute to invoke sanctions against credit unions which violate their charters. If a credit union's charter provided that only whites could be officers of the credit union and if the by-laws provided that white members should receive preferential treatment vis-a-vis black members, then the line drawn in *Irvis* would be crossed. The State would not only be encouraging discrimination, it would be requiring it. As the Pennsylvania Liquor Control Board violated the Fourteenth Amendment by its regulation requiring every licensee to adhere to its constitution and by-laws, the Georgia Commissioner of Banking and Finance would run afoul of the Fourteenth Amendment by approving discriminatory by-laws and by re-

this State that such credit union is insolvent, or is conducting its business in an unsafe or unauthorized manner, or has violated its charter or any law of this State, or that the par value of its capital shares is impaired by more than 10 per cent., or when any such credit union shall refuse to submit its records to the inspection and examination of the Superintendent of Banks, or his authorized agent, or when any such credit union shall suspend payment of its obligation, or fail to pay any final judgment from which no appeal lies within 10 days after its rendition, or when the Superintendent of Banks shall have reason to conclude from any examination of such credit union that it is in an unsafe or unsound condition, or when any such credit union shall refuse or neglect to obey any law or lawful order of the superintendent, the Superintendent of Banks, by himself or his duly authorized agent, shall forthwith take possession of the assets and business of such credit union and retain possession thereof until such credit union shall be authorized by him to resume business or its affairs are liquidated."

9. In Millenson v. New Hotel Monteleone, Inc., 475 F.2d 736 (5th Cir. 1973) the Fifth Circuit indicated there would be causation if the state licensing system encourages, mandates, or affirmatively authorizes the alleged discrimination. *Also see* Jr. C. of C. of Rochester, Inc., N.Y. v. United States Jaycees, Tulsa, Okla., 495 F.2d 883, 886–887 (10th Cir. 1974) ; Bond v. Dentzer, 494 F.2d 302, 305 (2nd Cir. 1974).

10. ·*See* notes 6 and 8 *supra* and accompanying texts.

quiring a credit union to comply with a discriminatory charter or face liquidation. Such a case is, however, not the one before the Court. In the present case the only involvement by the State in the case as alleged by plaintiffs is that the State continues to allow the Atlanta Postal Credit Union to exist. Plaintiffs have not alleged that the State (through the defendant Commissioner) encourages, mandates, or requires the Atlanta Postal Credit Union's alleged discriminatory practices.

The Court recognizes that it is not necessary that the State be overtly or directly involved in order to find State caused discrimination.[11] As has been recognized [12] though a line must be drawn somewhere. There must be a point at which the State can not be said to be the cause of the harm. In this Section 1983 action the Court has found that point by relying upon established principles of causation. The Court suggests that the analysis used is one that may be meaningful in many Section 1983 actions; the Court finds it particularly appropriate in this case.

A final point deserves mention. Defendant has raised the issue of immunity from suit. Because the Court finds other grounds are dispositive, the Court does not reach this issue.

In conclusion, the Court finds that plaintiffs fail to allege any facts which would entitle them to relief; accordingly, defendant is entitled to judgment. The action should be dismissed and judgment entered.

It is so ordered.

11. *See e. g.*, Food Employees v. Logan Valley Plaza, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed. 2d 603 (1968) ; (traditional state function filled by private entity) ; Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 1967) (state encouraged discrimination) ; Burton v. Wilmington Packing Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) (state authorized discrimination).

12. *See, e. g.*, Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972) ; Lloyd Corporation v. Tanner, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972) ; Evans v. Abney, 396 U.S. 435, 90 S.Ct. 628, 24 L.Ed.2d 634 (1970).